# GREENE *v.* McELROY ET AL.

No. 180.   Argued April 1, 1959.—Decided June 29, 1959.

*Carl W. Berueffy* argued the cause and filed a brief for petitioner.

*Assistant Attorney General Doub* argued the cause for respondents. With him on the brief were *Solicitor General Rankin, Samuel D. Slade* and *Bernard Cedarbaum.*

*David I. Shapiro,* filed a brief for the American Civil Liberties Union, as *amicus curiae,* urging reversal.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

This case involves the validity of the Government's revocation of security clearance granted to petitioner, an aeronautical engineer employed by a private manufacturer which produced goods for the armed services. Petitioner was discharged from his employment solely as a consequence of the revocation because his access to classified information was required by the nature of his job. After his discharge, petitioner was unable to secure

employment as an aeronautical engineer and for all prac-
tical purposes that field of endeavor is now closed to him.

Petitioner was vice president and general manager of
Engineering and Research Corporation (ERCO), a busi-
ness devoted primarily to developing and manufacturing
various mechanical and electronic products.  He began
this employment in 1937 soon after his graduation from
the Guggenheim School of Aeronautics and, except for a
brief leave of absence, he stayed with the firm until his
discharge in 1953.  He was first employed as a junior
engineer and draftsman.  Because of the excellence of
his work he eventually became a chief executive officer of
the firm.  During his career with ERCO, he was credited
with the expedited development of a complicated elec-
tronic flight simulator and with the design of a rocket
launcher, both of which were produced by ERCO and long
used by the Navy.

During the post-World War II period, petitioner was
given security clearances on three occasions.[1]  These were
required by the nature of the projects undertaken by
ERCO for the various armed services.[2]  On November 21,

---

[1] Petitioner was given a Confidential clearance by the Army on
August 9, 1949, a Top Secret clearance by the Assistant Chief of
Staff G–2, Military District of Washington on November 9, 1949,
and a Top Secret clearance by the Air Materiel Command on Feb-
ruary 3, 1950.

[2] ERCO did classified contract work for the various services.  In
1951, in connection with a classified research project for the Navy,
it entered into a security agreement in which it undertook "to pro-
vide and maintain a system of security controls within its . . . own
organization in accordance with the requirements of the Department
of Defense Industrial Security Manual . . . ."  The Manual, in turn,
provided in paragraphs 4 (e) and 6:

"The Contractor shall exclude (this does not imply the dismissal
or separation of any employee) from any part of its plants, factories,
or sites at which work for any military department is being per-
formed, any person or persons whom the Secretary of the military

1951, however, the Army-Navy-Air Force Personnel Security Board (PSB) advised ERCO that the company's clearances for access to classified information were in jeopardy because of a tentative decision to deny petitioner access to classified Department of Defense information and to revoke his clearance for security reasons.[3] ERCO was invited to respond to this notification. The corporation, through its president, informed PSB that petitioner had taken an extended furlough due to the Board's action. The ERCO executive also stated that in his opinion petitioner was a loyal and discreet United States citizen and that his absence denied to the firm the services of an outstanding engineer and administrative executive. On December 11, 1951, petitioner was informed by the Board that it had "decided that access by you to contract work and information [at ERCO] . . . . would be inimical to

---

department concerned or his duly authorized representative, in the interest of security, may designate in writing.

"No individual shall be permitted to have access to classified matter unless cleared by the Government or the Contractor, as the case may be, as specified in the following subparagraphs and then he will be given access to such matter only to the extent of his clearance. . . ."

[3] The PSB was created pursuant to an interim agreement dated October 9, 1947, between the Army, Navy, and Air Force and pursuant to a memorandum of agreement between the Provost Marshal General and the Air Provost Marshal, dated March 17, 1948. "It was a three-man board, with one representative from each of the military departments . . . . Its functions were to grant or deny clearance for employment on aeronautical or classified contract work when such consent was required, and to suspend individuals, whose continued employment was considered inimical to the security interests of the United States, from employment on classified work." Report of the Commission on Government Security, 1957, S. Doc. No. 64, 85th Cong., 1st Sess. 239. It established its own procedures which were approved by the Secretaries of the Army, Navy, and Air Force. See "Procedures Governing the Army-Navy-Air Force Personnel Security Board, dated 19 June 1950."

.the best interests of the United States." Accordingly, the PSB revoked petitioner's clearances. He was informed that he could seek a hearing before the Industrial Employment Review Board (IERB), and he took this course.[4] Prior to the hearing, petitioner received a letter informing him that the PSB action was based on information indicating that between 1943 and 1947 he had associated with Communists, visited officials of the Russian Embassy, and attended a dinner given by an allegedly Communist Front organization.[5]

On January 23, 1952, petitioner, with counsel, appeared before the IERB. He was questioned in detail concerning his background and the information disclosed in the IERB letter. In response to numerous and searching questions he explained in substance that specific "suspect" persons with whom he was said to have associated were actually friends of his ex-wife. He explained in some detail that during his first marriage, which lasted from

[4] The IERB was a four-member board which was given jurisdiction to hear and review appeals from decisions of the PSB. Its charter, dated 7 November 1949 and signed by the Secretaries of the Army, Navy, and Air Force, contemplated that it would afford hearings to persons denied clearance. And see "Procedures Governing Appeals to the Industrial Employment Review Board, dated 7 November 1949."

[5] The letter read, in part:

"That over a period of years, 1943–1947, at or near Washington, D. C., you have closely and sympathetically associated with persons who are reported to be or to have been members of the Communist Party; that during the period 1944–1947 you entertained and were visited at your home by military representatives of the Russian Embassy, Washington, D. C.; that, further, you attended social functions during the period 1944–1947 at the Russian Embassy, Washington, D. C.; and on 7 April 1947 attended the Southern Conference for Human Welfare, Third Annual Dinner, Statler Hotel, Washington, D. C. (Cited as Communist Front organization, Congressional Committee on Un-American Activities)."

1942 through 1947, his then wife held views with which he did not concur and was friendly with associates and other persons with whom he had little in common. He stated that these basic disagreements were the prime reasons that the marriage ended in failure. He attributed to his then wife his attendance at the dinner, his membership in a bookshop association which purportedly was a "front" organization, and the presence in his home of "Communist" publications. He denied categorically that he had ever been a "Communist" and he spoke at length about his dislike for "a theory of Government which has for its object the common ownership of property." Lastly, petitioner explained that his visits to persons in various foreign embassies (including the Russian Embassy) were made in connection with his attempts to sell ERCO's products to their Governments. Petitioner's witnesses, who included top-level executives of ERCO and a number of military officers who had worked with petitioner in the past, corroborated many of petitioner's statements and testified in substance that he was a loyal and discreet citizen. These top-level executives of ERCO, whose right to clearance was never challenged, corroborated petitioner's testimony concerning his reasons for visiting the Russian Embassy.

The Government presented no witnesses. It was obvious, however, from the questions posed to petitioner and to his witnesses, that the Board relied on confidential reports which were never made available to petitioner. These reports apparently were compilations of statements taken from various persons contacted by an investigatory agency. Petitioner had no opportunity to confront and question persons whose statements reflected adversely on him or to confront the government investigators who took their statements. Moreover, it seemed evident that the Board itself had never questioned the investigators and

had never seen those persons whose statements were the subject of their reports.

On January 29, 1952, the IERB, on the basis of the testimony given at the hearing and the confidential reports, reversed the action of the PSB and informed petitioner and ERCO that petitioner was authorized to work on Secret contract work.

On March 27, 1953, the Secretary of Defense abolished the PSB and IERB and directed the Secretaries of the three armed services to establish regional Industrial Personnel Security Boards to coordinate the industrial security program.[6] The Secretaries were also instructed to establish uniform standards, criteria, and procedures.[7]

---

[6] The Boards were abolished pursuant to a memorandum of March 27, 1953, issued by the Secretary of Defense to the Secretaries of the Army, Navy, and Air Force and to the Chairman of the Munitions Board. It provided in part:

"5. The Department of the Army, Navy and Air Force shall establish such number of geographical regions within the United States as seems appropriate to the work-load in each region. There shall then be established within each region an Industrial Personnel Security Board. This board shall consist of two separate and distinct divisions, a Screening Division and an Appeal Division, with equal representation of the Departments of the Army, Navy and Air Force on each such division. The Appeal Division shall have jurisdiction to hear appeals from the decision of the Screening Division and its decisions shall be determined by a majority vote which shall be final, subject only to reconsideration on its own motion or at the request of the appellant for good cause shown or at the request of the Secretary of any military department."

[7] The memorandum from the Secretary of Defense also provided:

"6. The Secretaries of the Army, Navy and Air Force, shall within thirty days (30), establish such geographical regions and develop joint uniform standards, criteria, and detailed procedures to implement the above-described program. In developing the standards, criteria, and procedures, full consideration shall be given to the rights of individuals, consistent with security requirements. After approval by

Cases pending before the PSB and IERB were referred to these new Boards.[8] During the interim period between the abolishment of the old program and the implementation of the new one, the Secretaries considered themselves charged with administering clearance activities under previously stated criteria.[9]

On April 17, 1953, respondent Anderson, the Secretary of the Navy, wrote ERCO that he had reviewed petitioner's case and had concluded that petitioner's "continued access to Navy classified security information [was] inconsistent with the best interests of National Security." No hearing preceded this notification. He requested ERCO to exclude petitioner "from any part of your plants, factories or sites at which classified Navy projects are being carried out and to bar him access to all Navy classified information." He also advised the corporation that petitioner's case was being referred to the Secretary of Defense with the recommendation that the IERB's decision of January 29, 1952, be overruled. ERCO had no choice but to comply with the request.[10]

the Secretaries of the Army, Navy, and Air Force, the standards, criteria, and procedures shall govern the operations of the Board."

[8] The memorandum provided:

"7. All cases pending before the Army-Navy-Air Force Personnel Security Board and the Industrial Employment Review Board shall be referred for action under this order to the appropriate Industrial Personnel Security Board."

[9] The memorandum further provided:

"4. The Criteria Governing Actions by the Industrial Employment Review Board, dated 7 November 1949, as revised 10 November 1950, and approved by the Secretaries of the Army, Navy, and Air Force, shall govern security clearances of industrial facilities and industrial personnel by the Secretaries of the Army, Navy and Air Force until such time as uniform criteria are established in connection with paragraph 6 of this memorandum."

[10] See note 2, supra.

This led to petitioner's discharge.[11] ERCO informed the Navy of what had occurred and requested an opportunity to discuss the matter in view of petitioner's importance to the firm.[12] The Navy replied that "[a]s far as the Navy

---

[11] The Chairman of the Board of ERCO, Colonel Henry Berliner, later testified by affidavit as follows:

"During the year 1953, and for many years previous thereto, I was the principal stockholder of Engineering and Research Corporation, a corporation which had its principal place of business at Riverdale, Maryland. I was also the chairman of the board, and the principal executive officer of this corporation.

"I am acquainted with William Lewis Greene. Prior to the month of April, 1953, Mr. Greene was Vice-President in charge of engineering and General Manager of Engineering and Research Corporation. He has been employed by this corporation since 1937. His progress in the company had been consistent. He was one of our most valued and valuable employees, and was responsible for much of the work which Engineering and Research Corporation was doing. In April, 1953, the company received a letter from the Secretary of the Navy advising us that clearance had been denied to Mr. Greene and advising us that it would be necessary to bar him from access to our plant. In view of his position with the company, there was no work which he could do in light of this denial of clearance by the Navy. As a result, it was necessary for the company to discharge him. There was no other reason for Mr. Greene's discharge, and in the absence of the letter referred to, he could have continued in the employment of Engineering and Research Corporation indefinitely."

[12] The President of ERCO wrote to the Secretary of the Navy as follows:

"The Honorable R. B. Anderson
"Secretary of the Navy
"Washington 25, D. C.

"My dear Mr. Secretary:

"Receipt is acknowledged of your letter of April 17, 1953 in which you state that you have reviewed the case history file on William Lewis Greene and have concluded that his continued access to Navy classified security information is inconsistent with the best interests of National Security.

"You request this company to exclude Mr. Greene from our plants,

Department is concerned, any further discussion on this problem at this time will serve no useful purpose." ·

Petitioner asked for reconsideration of the decision. On October 13, 1953, the Navy wrote to him stating that it had requested the Eastern Industrial Personnel Security Board (EIPSB) to accept jurisdiction and to arrive at a final determination concerning petitioner's status.[13] Var-

---

factories or sites and to bar him from information, in the interests of protecting Navy classified projects and classified security information.

"In accordance with your request, please be advised that since receipt of your letter this company has excluded Mr. Greene from any part of our plants, factories or sites and barred him access to all classified security information.

"For your further information, Mr. Greene tendered his resignation as an officer of this corporation and has left the plant. We shall have no further contact with him until his status is clarified although we have not yet formally accepted his resignation.

"Mr. Greene is Vice President of this company in charge of engineering. His knowledge, experience and executive ability have proven of inestimable value in the past. The loss of his services at this time is a serious blow to company operations. Accordingly, we should like the privilege of a personal conference to discuss the matter further.

"Furthermore, you state that you are referring the case to the Secretary of Defense recommending that the Industrial Employment Review Board's decision of January 29, 1952 be overruled. If it is appropriate, we should like very much to have the privilege of discussing the matter with the Secretary of Defense.

"Please accept our thanks for any official courtesies which you are in a position to extend.

> "Respectfully yours,
> "Engineering and Research Corporation
> "By /s/ L. A. Wells"

[13] On May 4, 1953, pursuant to the memorandum of the Secretary of Defense dated March 27, 1953, see note 6, *supra*, the Secretaries of the military departments established regional Industrial Personnel Security Boards governed by generalized standards, criteria, and procedures.

ious letters were subsequently exchanged between petitioner's counsel and the EIPSB. These resulted finally in generalized charges, quoted in the margin, incorporating the information previously discussed with petitioner at his 1952 hearing before the IERB.[14]

---

[14] The specifications were contained in a letter to petitioner's counsel dated April 9, 1954, which was sent nineteen days before the hearing. That letter provided in part:

"Security considerations permit disclosure of the following information that has thus far resulted in the denial of clearance to Mr. Greene:

"1. During 1942 SUBJECT was a member of the Washington Book Shop Association, an organization that has been officially cited by the Attorney General of the United States as Communist and subversive.

"2. SUBJECT's first wife, Jean Hinton Greene, to whom he was married from approximately December 1942 to approximately December 1947, was an ardent Communist during the greater part of the period of the marriage.

"3. During the period of SUBJECT's first marriage he and his wife had many Communist publications in their home, including the 'Daily Worker'; 'Soviet Russia Today'; 'In Fact'; and Karl Marx's 'Das Kapital.'

"4. Many apparently reliable witnesses have testified that during the period of SUBJECT's first marriage his personal political sympathies were in general accord with those of his wife, in that he was sympathetic towards Russia; followed the Communist Party 'line'; presented 'fellow-traveller' arguments; was apparently influenced by 'Jean's wild theories'; etc. [Nothing in the record establishes that any witness "testified" at any hearing on these subjects and everything in the record indicates that they could have done no more than make such statements to investigative officers.]

"5. In about 1946 SUBJECT invested approximately $1000. in the Metropolitan Broadcasting Corporation and later became a director of its Radio Station WQQW. It has been reliably reported that many of the stockholders of the Corporation were Communists or pro-Communists and that the news coverage and radio programs of Station WQQW frequently paralleled the Communist Party 'line.' [This station is now Station WGMS, Washington's "Good Music Station." Petitioner stated that he invested money in the station

On April 28, 1954, more than one year after the Secretary took action, and for the two days thereafter, petitioner presented his case to the EIPSB and was cross-examined in detail. The hearing began with a

because he liked classical music and he considered it a good investment.]

"6. On 7 April 1947 SUBJECT and his wife Jean attended the Third Annual Dinner of the Southern Conference for Human Welfare, an organization that has been officially cited as a Communist front. [This dinner was also attended by many Washington notables, including several members of this Court.]

"7. Beginning about 1942 and continuing for several years thereafter SUBJECT maintained sympathetic associations with various officials of the Soviet Embassy, including Major Constantine I. Ovchinnikov, Col. Pavel F. Berezin, Major Pavel N. Asseev, Col. Ilia M. Saraev, and Col. Anatoly Y. Golkovsky. [High-level executives of ERCO, as above noted, testified that these associations were carried on to secure business for the corporation.]

"8. During 1946 and 1947 SUBJECT had frequent sympathetic association with Dr. Vaso Syrzentic of the Yugoslav Embassy. Dr. Syrzentic has been identified as an agent of the International Communist Party. [Petitioner testified that he met this individual once in connection with a business transaction.]

"9. During 1943 SUBJECT was in contact with Col. Alexander Hess of the Czechoslovak Embassy, who has been identified as an agent of the Red Army Intelligence. [This charge was apparently abandoned as no adverse finding was based on it.]

"10. During 1946 and 1947 SUBJECT maintained close and sympathetic association with Mr. and Mrs. Nathan Gregory Silvermaster and William Ludwig Ullman. Silvermaster and Ullman have been identified as members of a Soviet Espionage Apparatus active in Washington, D. C., during the 1940's. [Silvermaster was a top economist in the Department of Agriculture and the direct superior of petitioner's ex-wife who then worked in that department.]

"11. SUBJECT had a series of contacts with Laughlin Currie during the period 1945–48. Currie has also been identified as a member of the Silvermaster espionage group. [Petitioner met Currie in the executive offices of the President at a time when Currie was a Special Assistant to the President.]

"12. During the period between 1942 and 1947 SUBJECT maintained frequent and close associations with many Communist Party

statement by the Chairman, which included the following passage:

> "The transcript to be made of this hearing will not include all material in the file of the case, in that, it will not include reports of investigation conducted by the Federal Bureau of Investigation or other investigative agencies which are confidential. Neither will it contain information concerning the identity of confidential informants or information which will reveal the source of confidential evidence. The transcript will contain only the Statement of Reasons, your answer thereto and the testimony actually taken at this hearing."

Petitioner was again advised that the revocation of his security clearance was based on incidents occurring between 1942 and 1947, including his associations with alleged Communists, his visits with officials of the Russian Embassy, and the presence in his house of Communist literature.

Petitioner, in response to a question, stated at the outset of the hearing that he was then employed at a salary of $4,700 per year as an architectural draftsman and that he had been receiving $18,000 per year as Vice President and General Manager of ERCO. He later explained that

---

members, including R———— S————, and his wife E————, B———— W———— and his wife M————, M———— P————, M.———— L. D————, R———— N———— and I———— S————. [These persons were apparently friends of petitioner's ex-wife.]

"13. During substantially the same period SUBJECT maintained close association with many persons who have been identified as strong supporters of the Communist conspiracy, including S———— J. R————, S———— L————, O———— L————, E———— F———— and V———— G————. [These persons were apparently friends of his ex-wife.]

"It is noted that all of the above information has previously been discussed with Mr. Greene at his hearing before the Industrial Employment Review Board, and that a copy of the transcript of that hearing was made available to you in August of last year."

after his discharge from ERCO he had unsuccessfully tried to obtain employment in the aeronautics field but had been barricaded from it because of lack of clearance.[15]

Petitioner was subjected to an intense examination similar to that which he experienced before the IERB in 1952. During the course of the examination, the Board injected new subjects of inquiry and made it evident that it was relying on various investigatory reports and statements of confidential informants which were not made available to petitioner.[16] Petitioner reiterated in great detail the

---

[15] Petitioner stated by affidavit in support of his motion for summary judgment that "[a]fter my discharge from Engineering and Research Corporation, I made every possible effort to secure other employment at a salary commensurate with my experience, but I was unable to do so because all of my work history had been in the field of aeronautics. In spite of everything I could do, the best position I could obtain was a draftsman-engineer in an architectural firm. I was obliged to go to work for a salary of $4,400 per year, because the basis upon which a higher salary would be justified was experience in a field which was not particularly useful in the type of work which I was able to obtain. As a result of the actions of the defendants complained of, the field of aeronautical engineering was closed to me."

[16] For instance, the following questions were asked in connection with the so-called "left wing" radio station in which petitioner owned stock, petitioner's acquaintanceship with alleged subversives, and petitioner's business relationships with foreign governments:

"Q. We have information here, Mr. Greene, that one particular individual specifically called your attention to the fact that [Congressman] Rankin and [Senator] Bilbo had characterized this station as a Communist station, run by and for Communists?

"Q. We have information here, this has come from an informant characterized to be of known reliability in which he refers to conversations he had with you about January of 1947 in which you told him that you had visited M——— P——— the previous evening and had become rather chummy with him, do you wish to comment on that?

"Q. Concerning your relationship with S——— L———, we have

explanations previously given before the IERB. He was subjected to intense cross-examination, however, concerning reports that he had agreed with the views held by his ex-wife.

information here from an informant characterized as being one of known reliability, in which S——— L——— told this informant that shortly following her Western High School speech in 1947, she remarked to you that probably many people will learn things about Russia and she quoted you as replying, 'Well I hope they learn something good, at least.' Do you wish to say anything about that?

"Q. Information we have, Mr. Greene, indicates first of all, that you didn't meet these Russians in 1942 but you met them in early 1943.

"Q. Now, we have further information, Mr. Greene, indicating that the initiative of these contacts came from Col. Berezin.

"Q. We have information here indicating that as a matter of fact, sir, we do know that the meeting between you and Col. Berezin was arranged through Hess and Hochfeld as you indicated. We also have information from a source identified as being one of known reliability referring to a conversation that this source had with Hess in April 1943 in which Hess stated that he had been talking to one Harry, not further identified but presumed to be Hochfeld and that Harry said to Hess that he had a young engineer who is a good friend of ours and of our cause and Harry wanted Hess to set up a meeting between Berezin and yourself. Can you give us some reason why Harry might have referred to you as a good friend of our cause?

"Q. Of course, we can make certain assumptions as to why Col. Berezin might have wanted to meet you back in December 1942 when we look at a statement like this indicating that you were considered a good friend of their's and of their cause. Of course, some weight is lent to this assumption by the fact that your wife was strongly pro-Communist and after she left you she became very active in Communist affairs, in case you don't know that, I'll pass it on to you."

And the following questions were asked of various witnesses presented

Petitioner again presented a number of witnesses who testified that he was loyal, that he had spoken approvingly of the United States and its economic system, that he was a valuable engineer, and that he had made valuable and significant contributions to this country's war efforts during World War II and the Korean War.

Soon after the conclusion of the hearing, the EIPSB notified petitioner that it had affirmed the Secretary's action and that it had decided that the granting of clearance to petitioner for access to classified information was "not clearly consistent with the interests of national security." Petitioner requested that he be furnished with a detailed statement of findings supporting the Board's decision. He was informed, however, that security con-

---

by petitioner evidently because the Board had confidential information that petitioner's ex-wife was "eccentric."

"Q. Now you were in Bill's home, that red brick house that you're talking about.

"Q. Was there anything unusual about the house itself, the interior of it, was it dirty?

"Q. Were there any beds in their house which had no mattresses on them?

"Q. Did you ever hear it said that Jean slept on a board in order to keep the common touch?

"Q. When you were in Jean's home did she dress conventionally when she received her guests?

"Q. Let me ask you this, conventionally when somebody would invite you for dinner at their home would you expect them, if they were a woman to wear a dress and shoes and stockings and the usual clothing of the evening or would you expect them to appear in overalls?"

siderations prohibited such disclosure.[17] On September 16, 1955, petitioner requested review by the Industrial Personnel Security Review Board.[18] On March 12, 1956, almost three years after the Secretary's action and nearly one year after the second hearing, he received a letter from the Director of the Office of Industrial Personnel Security Review informing him that the EIPSB had found that from 1942–1947 petitioner associated closely with his then wife and her friends, knowing that they were active in behalf of and sympathized with the Communist Party, that during part of this period petitioner maintained a sympathetic association with a number of officials of the Russian Embassy, that during this period petitioner's political views were similar to those of his then wife, that petitioner had been a member of a suspect bookshop association, had invested money in a suspect radio station, had attended a suspect dinner, and had, on occasion, Communist publications in his home, and that petitioner's credibility as a witness in the proceedings was doubtful. The letter also stated that the doubts concerning petitioner's credibility affected the Board's evaluation of his trustworthiness and that only trustworthy persons could be afforded access to classified information.[19] The EIPSB determination was affirmed.

After the EIPSB decision in 1954, petitioner filed a complaint in the United States District Court for the Dis-

[17] The notification stated:

"Security considerations prohibit the furnishing to an appellant of a detailed statement of the findings on appeal inasmuch as the entire file is considered and comments made by the Appeal Division panel on security matters which could not for security reasons form the basis of a statement of reasons."

[18] This Board was created by the Secretary of Defense on February 2, 1955, and given power to review adverse decisions rendered by the regional boards.

[19] This was the first time that petitioner was charged or found to be untrustworthy.

trict of Columbia asking for a declaration that the revocation was unlawful and void and for an order restraining respondents from acting pursuant to it.[20]  He also asked for an order requiring respondents to advise ERCO that the clearance revocation was void.  Following the affirmance of the EIPSB order by the Industrial Personnel Review Board, petitioner moved for summary judgment in the District Court.  The Government cross-filed for dismissal of the complaint or summary judgment.  The District Court granted the Government's motion for summary judgment, 150 F. Supp. 958, and the Court of Appeals affirmed that disposition, 103 U. S. App. D. C. 87, 254 F. 2d 944.

The Court of Appeals recognized that petitioner had suffered substantial harm from the clearance revocation.[21]  But in that court's view, petitioner's suit presented no "justiciable controversy"—no controversy which the courts could finally and effectively decide.  This conclusion followed from the Court of Appeals' reasoning that the Executive Department alone is competent to evaluate the competing considerations which exist in determining the persons who are to be afforded security clearances.

[20] The complaint was filed before the establishment of the Industrial Personnel Security Review Board.  See note 18, *supra*.

[21] The Court of Appeals stated: "We have no doubt that Greene has in fact been injured.  He was forced out of a job that paid him $18,000 per year.  He has since been reduced, so far as this record shows, to working as an architectural draftsman at a salary of some $4,400 per year.  Further, as an aeronautical engineer of considerable experience he says (without real contradiction) that he is effectively barred from pursuit of many aspects of his profession, given the current dependence of most phases of the aircraft industry on Defense Department contracts not only for production but for research and development work as well. . . .  Nor do we doubt that, following the Government's action, some stigma, in greater or less degree, has attached to Greene."  103 U. S. App. D. C. 87, 95–96, 254 F. 2d 944, 952–953.

The court also rejected petitioner's claim that he was deprived of his livelihood without the traditional safeguards required by "due process of law" such as confrontation of his accusers and access to confidential reports used to determine his fitness. Central to this determination was the court's unwillingness to order the Government to choose between disclosing the identities of informants or giving petitioner clearance.

Petitioner contends that the action of the Department of Defense in barring him from access to classified information on the basis of statements of confidential informants made to investigators was not authorized by either Congress or the President and has denied him "liberty" and "property" without "due process of law" in contravention of the Fifth Amendment. The alleged property is petitioner's employment; the alleged liberty is petitioner's freedom to practice his chosen profession. Respondents admit, as they must, that the revocation of security clearance caused petitioner to lose his job with ERCO and has seriously affected, if not destroyed, his ability to obtain employment in the aeronautics field. Although the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the "liberty" and "property" concepts of the Fifth Amendment, *Dent* v. *West Virginia,* 129 U. S. 114; *Schware* v. *Board of Bar Examiners,* 353 U. S. 232; *Peters* v. *Hobby,* 349 U. S. 331, 352 (concurring opinion); cf. *Slochower* v. *Board of Education,* 350 U. S. 551; *Truax* v. *Raich,* 239 U. S. 33, 41; *Allgeyer* v. *Louisiana,* 165 U. S. 578, 589–590; *Powell* v. *Pennsylvania,* 127 U. S. 678, 684, respondents contend that the admitted interferences which have occurred are indirect by-products of necessary governmental action to protect the integrity of secret information and hence are not unreasonable and do not constitute deprivations within the meaning of the Amendment.

Alternatively, respondents urge that even if petitioner has been restrained in the enjoyment of constitutionally protected rights, he was accorded due process of law in that he was permitted to utilize those procedural safeguards consonant with an effective clearance program, in the administration of which the identity of informants and their statements are kept secret to insure an unimpaired flow to the Government of information concerning subversive conduct. But in view of our conclusion that this case should be decided on the narrower ground of "authorization," we find that we need not determine the answers to these questions.[22]

The issue, as we see it, is whether the Department of Defense has been authorized to create an industrial security clearance program under which affected persons may lose their jobs and may be restrained in following their chosen professions on the basis of fact determinations concerning their fitness for clearance made in proceedings in which they are denied the traditional procedural safeguards of confrontation and cross-examination.

Prior to World War II, only sporadic efforts were made to control the clearance of persons who worked in private establishments which manufactured materials for national defense. Report of the Commission on Government Security, 1957, S. Doc. No. 64, 85th Cong., 1st Sess. 236. During World War II the War Department instituted a

---

[22] We note our agreement with respondents' concession that petitioner has standing to bring this suit and to assert whatever rights he may have. Respondents' actions, directed at petitioner as an individual, caused substantial injuries, *Joint Anti-Fascist Committee* v. *McGrath,* 341 U. S. 123, 152 (concurring opinion), and, were they the subject of a suit between private persons, they could be attacked as an invasion of a legally protected right to be free from arbitrary interference with private contractual relationships. Moreover, petitioner has the right to be free from unauthorized actions of government officials which substantially impair his property interests. Cf. *Philadelphia Co.* v. *Stimson,* 223 U. S. 605.

formalized program to obtain the discharge from war plants of persons engaged in sabotage, espionage, and willful activity designed to disrupt the national defense program. *Id.*, at 237. In 1946, the War Department began to require contractors, before being given access to classified information, to sign secrecy agreements which required consent before their employees were permitted access to Top Secret or Secret information. *Id.*, at 238. At the outset, each armed service administered its own industrial clearance program. *Id.*, at 239. Later, the PSB and IERB were established by the Department of Defense and the Secretaries of the armed services to administer a more centralized program. *Ibid.* Confusion existed concerning the criteria and procedures to be employed by these boards. *Ibid.* Eventually, generalized procedures were established with the approval of the Secretaries which provided in part that before the IERB "[t]he hearing will be conducted in such manner as to protect from disclosure information affecting the national security or tending to compromise investigative sources or methods . . . ." See "Procedures, Governing Appeals to the Industrial Employment Review Board, dated 7 November 1949," note 4, *supra,* § 4 (c). After abolition of these boards in 1953, and the establishment of the IPSB, various new sets of procedures were promulgated which likewise provided for the non-disclosure of information "tending to compromise investigative sources or methods or the indentity of confidential informants." [23]

---

[23] The Industrial Personnel Security Review Regulation, 20 Fed. Reg. 1553, recommended by the Secretaries of the Army, Navy, and Air Force, and approved by the Secretary of Defense, provided:

"§ 67.1–4. *Release of information.* All personnel in the Program will comply with applicable directives pertaining to the safeguarding of classified information and the handling of investigative reports. No classified information, nor any information which might com-

All of these programs and procedures were established by directives issued by the Secretary of Defense or the Secretaries of the Army, Navy, and Air Force. None was the creature of statute or of an Executive Order issued by the President.[24]

Respondents maintain that congressional authorization to the President to fashion a program which denies security clearance to persons on the basis of confidential information which the individuals have no opportunity to confront and test is unnecessary because the President has inherent authority to maintain military secrets inviolate. And respondents argue that if a statutory grant of power is necessary, such a grant can readily be *inferred* "as a necessarily implicit authority from the generalized provisions" of legislation dealing with the armed services.

promise investigative sources or methods or the identity of confidential informants, will be disclosed to any contractor or contractor employee, or to his lawyer or representatives, or to any other person not authorized to have access to such information. In addition, in a case involving a contractor employee the contractor concerned will be advised only of the final determination in the case to grant, deny, or revoke clearance, and of any decision to suspend a clearance granted previously pending final determination in the case. The contractor will not be given a copy of the Statement of Reasons issued to the contractor employee except at the written request of the contractor employee concerned."

[24] See "Charter of the Industrial Employment Review Board, dated 7 November 1949," note 4, *supra;* "Charter of the Army-Navy-Air Force Personnel Security Board, dated 19 June 1950," note 3, *supra;* Memorandum issued by the Secretary of Defense to the Secretaries of the Army, Navy, and Air Force and to the Chairman of the Munitions Board, dated March 27, 1953, notes 6, 7, 8 and 9, *supra;* "The Industrial Personnel and Facility Security Clearance Program," effective May 4, 1953, note 13, *supra;* "The Industrial Personnel Security Review Regulation," 20 Fed. Reg. 1553, 32 CFR Part 67 (1958 Supp.); Industrial Security Manual for Safeguarding Classified Information, 20 Fed. Reg. 6213, 21 Fed. Reg. 2814.

496

But the question which must be decided in this case is not whether the President has inherent power to act or whether Congress has granted him such a power; rather, it is whether either the President or Congress exercised such a power and delegated to the Department of Defense the authority to fashion such a program.

Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots.[25] They find expression in the Sixth Amendment which provides that in all criminal cases the accused shall enjoy the right "to be confronted with

---

[25] When Festus more than two thousand years ago reported to King Agrippa that Felix had given him a prisoner named Paul and that the priests and elders desired to have judgment against Paul, Festus is reported to have stated: "It is not the manner of the Romans to deliver any man to die, before that he which is accused have the accusers face to face, and have licence to answer for himself concerning the crime laid against him." Acts 25:16.

Professor Wigmore explains in some detail the emergence of the principle in Anglo-American law that confrontation and cross-examination are basic ingredients in a fair trial. 5 Wigmore on Evidence (3d ed. 1940) § 1364. And see O'Brian, National Security and Individual Freedom, 62.

the witnesses against him." This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases, *e. g., Mattox* v. *United States,* 156 U. S. 237, 242–244; *Kirby* v. *United States,* 174 U. S. 47; *Motes* v. *United States,* 178 U. S. 458, 474; *In re Oliver,* 333 U. S. 257, 273, but also in all types of cases where administrative and regulatory actions were under scrutiny. *E. g., Southern R. Co.* v. *Virginia,* 290 U. S. 190; *Ohio Bell Telephone Co.* v. *Public Utilities Commission,* 301 U. S. 292; *Morgan* v. *United States,* 304 U. S. 1, 19; *Carter* v. *Kubler,* 320 U. S. 243; *Reilly* v. *Pinkus,* 338 U. S. 269. Nor, as it has been pointed out, has Congress ignored these fundamental requirements in enacting regulatory legislation. *Joint Anti-Fascist Committee* v. *McGrath,* 341 U. S. 168–169 (concurring opinion).

Professor Wigmore, commenting on the importance of cross-examination, states in his treatise, 5 Wigmore on Evidence (3d ed. 1940) § 1367:

> "For two centuries past, the policy of the Anglo-American system of Evidence has been to regard the necessity of testing by cross-examination as a vital feature of the law. The belief that no safeguard for testing the value of human statements is comparable to that furnished by cross-examination, and the conviction that no statement (unless by special exception) should be used as testimony until it has been probed and sublimated by that test, has found increasing strength in lengthening experience."

Little need be added to this incisive summary statement except to point out that under the present clearance procedures not only is the testimony of absent witnesses allowed to stand without the probing questions of the person under attack which often uncover inconsistencies,

lapses of recollection, and bias,[26] but, in addition, even the members of the clearance boards do not see the informants or know their identities, but normally rely on an investigator's summary report of what the in-

---

[26] For instance, in the instant case, to establish the charge that petitioner's "personal political sympathies were in general accord with those of his wife," the EIPSB apparently relied on statements made to investigators by "old" friends of petitioner. Thus, the following questions were asked petitioner:

"Q. I'd like to read to you a quotation from the testimony of a person who had identified himself as having been a very close friend of yours over a long period of years. He states that you, as saying to him one day that you were reading a great deal of pro-Communist books and other literature. Do you wish to comment on that?

"Q. Incidentally this man's testimony concerning you was entirely favorable in one respect. He stated that he didn't think you were a Communist but he did state that he thought that you had been influenced by Jean's viewpoints and that he had received impressions definite that it was your wife who was parlor pink and that you were going along with her.

"Q. This same friend testified that he believed that you were influenced by Jean's wild theories and he decided at that time to have no further association with you and your wife . . . .

"Q. . . . Here's another man who indicates that he has been a friend of yours over a long period of time who states that he was a visitor in your home on occasions and that regarding some of these visits, he met some of your wife's friends, these people we've been talking about in the past and that one occasion, he mentioned in particular, the topic of conversation was China and that you set forth in the conversation and there seemed general agreement among all of you at that time that the revolutionists in China were not actually Communists but were agrarian reformists which as you probably know is part of the Communist propaganda line of several years back. . . .

"Q. Mr. Greene we've got some information here indicating that during the period of your marriage to your first wife that she was

formant said without even examining the investigator personally.[27]

We must determine against this background, whether the President or Congress has delegated to the Depart-

---

constantly finding fault with the American institutions, opposing the American Capitalistic System and never had anything but praise for the Russians and everything they attempted to do. Did you find that to be the case?

"Q. We have a statement here from another witness with respect to yourself in which he states that you felt that the modern people in this country were too rich and powerful, that the capitalistic system of this country was to the disadvantage of the working people and that the working people were exploited by the rich.

"Q. I have a statement from another one of your associates to the effect that you would at times, present to him a fellow-traveler argument. This man indicated to us that he was pretty well versed on the Communist Party line himself at that time and found you parroting arguments which he assumed that you got from your wife. Do you wish to comment on that?"
Confrontation of the persons who allegedly made these statements would have been of prime importance to petitioner, for cross-examination might have shown that these "witnesses" were hazy in recollecting long-past incidents, or were irrationally motivated by bias or vindictiveness.

[27] This is made clear by the following testimony of Jerome D. Fenton, Director, Industrial Personnel Security, Department of Defense, before the Subcommittee on Constitutional Rights of the Senate Judiciary Committee, given on November 23, 1955:

"[Q.] . . . What other type of evidence is received by the hearing boards besides the evidence of persons under oath?

"[A.] The reports from the various governmental investigative agencies.

"[Q.] And the reports of the various governmental investigations might, themselves, be hearsay, might they not?

"[A.] I think that is a fair statement.

"[Q.] In fact, they might be, as the Court of Appeals for the Ninth District [sic] said with respect to the port security program, second,

ment of Defense the authority to by-pass these tradi-
tional and well-recognized safeguards in an industrial
security clearance program which can operate to injure
individuals substantially by denying to them the oppor-
tunity to follow chosen private professions. Respondents
cite two Executive Orders which they believe show presi-
dential delegation. The first, Exec. Order No. 10290, 16
Fed. Reg. 9795, was entitled "Prescribing Regulations
Establishing Minimum Standards For The Classifica-
tion, Transmission, And Handling, By Departments And

---

or third, or fourth-hand hearsay, might they not? [This question
refers to the opinion of the Court of Appeals for the Ninth Circuit
in *Parker* v. *Lester*, 227 F. 2d 708.]

"[A.] The answer is 'Yes.'

"[Q.] Can you tell me what type of help is given to the hearing
board in these reports with respect to the matter of evaluation?
What is the nature of the evaluation that is used for this purpose?

"[A.] Well, each board has a person who is called a security adviser,
who is an expert in that particular area. Each screening board has
one, and those individuals are well-trained people who know how
to evaluate reports and evaluate information. They know how to
separate the wheat from the chaff, and they assist these boards.

"[Q.] This expert, then, has to take the report and make his own
determination in assisting the board as to the reliability of a witness
that he has never seen, or perhaps hasn't even had the opportunity
to see the person who interviewed the witness?

"[A.] Well, he has nothing to do with the witness; no.

"[Q.] What is that?

"[A.] He has not interviewed the witness; no."

Hearings before Subcommittee on Constitutional Rights, Senate
Judiciary Committee, on S. Res. 94, 84th Cong., 2d Sess. 623–624.
And cf. Richardson, The Federal Employee Loyalty Program, 51 Col.
L. Rev. 546, and Hearings before a Subcommittee of the Senate
Foreign Relations Committee on S. Res. 231, 81st Cong., 2d Sess.
327–339 (statement of J. Edgar Hoover, Director, Federal Bureau of
Investigation).

Agencies of the Executive Branch, Of Official Information Which Requires Safeguarding In The Interest Of The Security Of The United States." It provided, in relevant part:

"PART V—DISSEMINATION OF CLASSIFIED SECURITY INFORMATION

"29. *General.* a. No person shall be entitled to knowledge or possession of, or access to, classified security information solely by virtue of his office or position.

"b. Classified security information shall not be discussed with or in the presence of unauthorized persons, and the latter shall not be permitted to inspect or have access to such information.

"c. The head of each agency shall establish a system for controlling the dissemination of classified security information adequate to the needs of his agency.

"30. *Limitations on dissemination—a. Within the Executive Branch.* The dissemination of classified security information shall be limited to persons whose official duties require knowledge of such information. Special measures shall be employed to limit the dissemination of 'Top Secret' security information to the absolute minimum. Only that portion of 'Top Secret' security information necessary to the proper planning and appropriate action of any organizational unit or individual shall be released to such unit or individual.

"b. *Outside the Executive Branch.* Classified security information shall not be disseminated outside the Executive Branch by any person or agency having access thereto or knowledge thereof except under conditions and through channels authorized by

the head of the disseminating agency, even though such person or agency may have been solely or partly responsible for its production."

The second, Exec. Order No. 10501, 18 Fed. Reg. 7049, which revoked Exec. Order No. 10290, is entitled "Safeguarding Official Information In The Interests Of The Defense Of The United States" and provides in relevant part:

"Sec. 7. *Accountability and Dissemination.*

.  .        .        .        .

"(b) *Dissemination Outside the Executive Branch.* Classified defense information shall not be disseminated outside the executive branch except under conditions and through channels authorized by the head of the disseminating department or agency, even though the person or agency to which dissemination of such information is proposed to be made may have been solely or partly responsible for its production."

Clearly, neither of these orders empowers any executive agency to fashion security programs whereby persons are deprived of their present civilian employment and of the opportunity of continued activity in their chosen professions without being accorded the chance to challenge effectively the evidence and testimony upon which an adverse security determination might rest.[28]

Turning to the legislative enactments which might be deemed as delegating authority to the Department of Defense to fashion programs under which persons may be

---

[28] No better, for this purpose, is Exec. Order No. 8972, 6 Fed. Reg. 6420, filed on December 12, 1941, which empowered the Secretary of War "to establish and maintain military guards and patrols, and to take other appropriate measures, to protect from injury or destruction national-defense material, national-defense premises, and national-defense utilities . . . ." Even if that order is relevant authority for programs created after World War II, which is doubtful, it provides no specific authorization for non-confrontation hearings.

seriously restrained in their employment opportunities through a denial of clearance without the safeguards of cross-examination and confrontation, we note the Government's own assertion, made in its brief, that "[w]ith petitioner's contention that the Industrial Security Program is not explicitly authorized by statute we may readily agree . . . ."

The first proffered statute is the National Security Act of 1947, as amended, 5 U. S. C. § 171 *et seq.* That Act created the Department of Defense and gave to the Secretary of Defense and the Secretaries of the armed services the authority to administer their departments. Nowhere in the Act, or its amendments, is there found specific authority to create a clearance program similar to the one now in effect.

Another Act cited by respondents is the Armed Service Procurement Act of 1947, as amended. It provides in 10 U. S. C. § 2304 that:

> "(a) Purchases of and contracts for property or services covered by this chapter shall be made by formal advertising. However, the head of an agency may negotiate such a purchase or contract, if—

> "(12) the purchase or contract is for property or services whose procurement he determines should not be publicly disclosed because of their character, ingredients, or components."

It further provides in 10 U. S. C. § 2306:

> "(a) The cost-plus-a-percentage-of-cost system of contracting may not be used. Subject to this limitation and subject to subsections (b)–(e), the head of an agency may, in negotiating contracts under section 2304 of this title, make any kind of contract that he considers will promote the best interests of the United States."

Respondents argue that these statutes, together with 18 U. S. C. § 798, which makes it a crime willfully and knowingly to communicate to unauthorized persons information concerning cryptographic or intelligence activities, and 50 U. S. C. § 783 (b), which makes it a crime for an officer or employee of the United States to communicate classified information to agents of foreign governments or officers and members of "Communist organizations," reflect a recognition by Congress of the existence of military secrets and the necessity of keeping those secrets inviolate.

Although these statutes make it apparent that Congress recognizes the existence of military secrets, they hardly constitute an authorization to create an elaborate clearance program which embodies procedures traditionally believed to be inadequate to protect affected persons.[29]

Lastly, the Government urges that if we refuse to adopt its "inferred" authorization reasoning, nevertheless, congressional ratification is apparent by the continued appropriation of funds to finance aspects of the program fashioned by the Department of Defense. Respondents refer us to Hearings before the House Committee on Appropriations on Department of Defense Appropriations for 1956, 84th Cong., 1st Sess. 774–781. At those hearings, the Committee was asked to approve the appropriation of funds to finance a program under which reimbursement for lost wages would be made to employees of government contractors who were temporarily denied, but later granted, security clearance. Apparently, such reim-

---

[29] As far as appears, the most substantial official notice which Congress had of the non-confrontation procedures used in screening industrial workers was embodied in S. Doc. No. 40, 84th Cong., 1st Sess., a 354-page compilation of laws, executive orders, and regulations relating to internal security, printed at the request of a single Senator, which reproduced, among other documents and without specific comment, the Industrial Personnel Security Review Regulation.

bursements had been made prior to that time out of general appropriations. Although a specific appropriation was eventually made for this purpose, it could not conceivably constitute a ratification of the hearing procedures, for the procedures were in no way involved in the special reimbursement program.[30]

---

[30] At the hearings to which we have been referred, the following passage from the testimony of the Department of Defense representative constitutes the only description made to the Committee concerning the procedures used in the Department's clearance program:

"In connection with the procurement programs of the Department of Defense, regulations have been prescribed to provide uniform standards and criteria for determining the eligibility of contractors, contractor employees, and certain other individuals, to have access to classified defense information. The regulations also establish administrative procedures governing the disposition of cases in which a military department, or activity thereof, has made a recommendation or determination (a) with respect to the denial, suspension, or revocation of a clearance of a contractor or contractor employee; and (b) with respect to the denial or withdrawal of authorization for access by certain other individuals.

"While the Department of Defense assumes, unless information to the contrary is received, that all contractors and contractor employees are loyal to the Government of the United States, the responsibilities of the Military Establishment necessitate vigorous application of policies designed to minimize the security risk incident to the use of classified information by such contractors and contractor employees. Accordingly, measures are taken to provide continuing assurance that no contractor or contractor employee will be granted a clearance if available information indicates that the granting of such clearance may not be clearly consistent with the interests of national security. At the same time, every possible safeguard within the limitations of national security will be provided to ensure that no contractor or contractor employee will be denied a clearance without an opportunity for a fair hearing." *Id.*, at 774.

This description hardly constitutes even notice to the Committee of the nature of the hearings afforded. Thus the appropriation could not "plainly show a purpose to bestow the precise authority which is claimed." *Ex parte Endo*, 323 U. S. 283, 303, n. 24. Likewise,

Respondents' argument on delegation resolves itself into the following: The President, in general terms, has authorized the Department of Defense to create procedures to restrict the dissemination of classified information and has apparently acquiesced in the elaborate program established by the Secretary of Defense even where application of the program results in restraints on traditional freedoms without the use of long-required procedural protections. Similarly, Congress, although it has not enacted specific legislation relating to clearance procedures to be utilized for industrial workers, has acquiesced in the existing Department of Defense program and has ratified it by specifically appropriating funds to finance one aspect of it.

If acquiescence or implied ratification were enough to show delegation of authority to take actions within the area of questionable constitutionality, we might agree with respondents that delegation has been shown here. In many circumstances, where the Government's freedom to act is clear, and the Congress or the President has provided general standards of action and has acquiesced in administrative interpretation, delegation may be inferred. Thus, even in the absence of specific delegation, we have no difficulty in finding, as we do, that the Department of Defense has been authorized to fashion and apply an industrial clearance program which affords affected persons the safeguards of confrontation and cross-examination. But this case does not present that situation. We deal here with substantial restraints on employment opportunities of numerous persons imposed in a manner which is in conflict with our long-accepted

appropriations of specific amounts for the Munitions Board or its successors, agencies with multifold objectives, without any mention of the uses to which the funds could be put, cannot be considered as a ratification of the use of the specified hearing procedures.

notions of fair procedures.[31]   Before we are asked to judge whether, in the context of security clearance cases, a person may be deprived of the right to follow his chosen profession without full hearings where accusers may be confronted, it must be made clear that the President or Congress, within their respective constitutional powers, specifically has decided that the imposed procedures are necessary and warranted and has authorized their use. Cf. *Watkins* v. *United States,* 354 U. S. 178; *Scull* v. *Virginia,* 359 U. S. 344.   Such decisions cannot be assumed by acquiescence or non-action.   *Kent* v. *Dulles,* 357 U. S. 116; *Peters* v. *Hobby,* 349 U. S. 331; *Ex parte Endo,* 323 U. S. 283, 301–302.   They must be made explicitly not only to assure that individuals are not deprived of cherished rights under procedures not actually authorized, see *Peters* v. *Hobby, supra,* but also because explicit action, especially in areas of doubtful constitutionality, requires careful and purposeful consideration by those responsible for enacting and implementing our laws.   Without explicit action by lawmakers, decisions of great constitutional import and effect would be relegated by default to administrators who, under our system of government, are not endowed with authority to decide them.

Where administrative action has raised serious constitutional problems, the Court has assumed that Congress or the President intended to afford those affected by the action the traditional safeguards of due process.   See, *e. g., The Japanese Immigrant Case,* 189 U. S. 86, 101; *Dismuke* v. *United States,* 297 U. S. 167, 172; *Ex parte Endo,* 323 U. S. 283, 299–300; *American Power Co.* v. *Securities and Exchange Comm'n,* 329 U. S. 90, 107–

---

[31] It is estimated that approximately three million persons having access to classified information are covered by the industrial security program.  Brown, Loyalty and Security (1958), 179–180; Association of the Bar of the City of New York, Report of the Special Committee on the Federal Loyalty-Security Program (1956), 64.

108; *Hannegan* v. *Esquire,* 327 U. S. 146, 156; *Wong Yang Sung* v. *McGrath,* 339 U. S. 33, 49. Cf. *Anniston Mfg. Co.* v. *Davis,* 301 U. S. 337; *United States* v. *Rumely,* 345 U. S. 41. These cases reflect the Court's concern that traditional forms of fair procedure not be restricted by implication or without the most explicit action by the Nation's lawmakers, even in areas where it is possible that the Constitution presents no inhibition.

In the instant case, petitioner's work opportunities have been severely limited on the basis of a fact determination rendered after a hearing which failed to comport with our traditional ideas of fair procedure. The type of hearing was the product of administrative decision not explicitly authorized by either Congress or the President. Whether those procedures under the circumstances comport with the Constitution we do not decide. Nor do we decide whether the President has inherent authority to create such a program, whether congressional action is necessary, or what the limits on executive or legislative authority may be. We decide only that in the absence of explicit authorization from either the President or Congress the respondents were not empowered to deprive petitioner of his job in a proceeding in which he was not afforded the safeguards of confrontation and cross-examination.

Accordingly, the judgment is reversed and the case is remanded to the District Court for proceedings not inconsistent herewith.

*It is so ordered.*

MR. JUSTICE FRANKFURTER, MR. JUSTICE HARLAN and MR. JUSTICE WHITTAKER concur in the judgment on the ground that it has not been shown that either Congress or the President authorized the procedures whereby petitioner's security clearance was revoked, intimating no views as to the validity of those procedures.

Mr. Justice Harlan, concurring specially.

What has been written on both sides of this case makes appropriate a further word from one who concurs in the judgment of the Court, but cannot join its opinion.

Unlike my brother Clark who finds this case "both clear and simple," I consider the constitutional issue it presents most difficult and far-reaching. In my view the Court quite properly declines to decide it in the present posture of the case. My unwillingness to subscribe to the Court's opinion is due to the fact that it unnecessarily deals with the very issue it disclaims deciding. For present purposes no more need be said than that we should not be drawn into deciding the constitutionality of the security-clearance revocation procedures employed in this case until the use of such procedures in matters of this kind has been deliberately considered and expressly authorized by the Congress or the President who alone are in a position to evaluate in the first instance the totality of factors bearing upon the necessity for their use. That much the courts are entitled to before they are asked to express a constitutional judgment upon an issue fraught with such important consequences both to the Government and the citizen.

Ample justification for abstaining from a constitutional decision at this stage of the case is afforded by the Court's traditional and wise rule of not reaching constitutional issues unnecessarily or prematurely. That rule indeed has been consistently followed by this Court when faced with "confrontation" issues in other security or loyalty cases. See *Peters* v. *Hobby*, 349 U. S. 331; *Vitarelli* v. *Seaton*, 359 U. S. 535; cf. *Service* v. *Dulles*, 354 U. S. 363; *Kent* v. *Dulles*, 357 U. S. 116. Adherence to that rule is, as I understand it, the underlying basis of today's decision, and it is on that basis that I join the judgment of the Court.

It is regrettable that my brother CLARK should have so far yielded to the temptations of colorful characterization as to depict the issue in this case as being whether a citizen has "a constitutional right to have access to the Government's military secrets," and to suggest that the Court's action today requires "the President's Cabinet members to revoke their refusal to give" the petitioner "access to military secrets," despite any views they may have as to his reliability. Of course this decision involves no such issue or consequences. The basic constitutional issue is not whether petitioner is entitled to access to classified material, but rather whether the particular procedures here employed to deny clearance on security grounds were constitutionally permissible. With good reason we do not reach that issue as matters now stand. And certainly there is nothing in the Court's opinion which suggests that petitioner must be given access to classified material.

MR. JUSTICE CLARK, dissenting.

To me this case is both clear and simple. The respondents, all members of the President's Cabinet, have, after a series of hearings, refused to give Greene further access to certain government military information which has been classified "secret." The pertinent Executive Order defines "secret" information as

"defense information or material the unauthorized disclosure of which could result in serious damage to the Nation, such as by jeopardizing the international relations of the United States, endangering the effectiveness of a program or policy of vital importance to the national defense, or compromising important military or defense plans, scientific or technological developments important to national defense, or information revealing important intelli-

gence operations." Exec. Order No. 10501, Nov. 5, 1953, 18 Fed. Reg. 7049, 3 CFR (1949–1953 Comp.), p. 979, § 1 (b).

Surely one does not have a constitutional right to have access to the Government's military secrets.[1] But the Court says that because of the refusal to grant Greene further access, he has lost his position as vice president and general manager, a chief executive officer, of ERCO, whose business was devoted wholly to defense contracts with the United States,[2] and that his training in aeronautical engineering, together with the facts that ERCO engages solely in government work and that the Government is the country's largest airplane customer, has in some unaccountable fashion parlayed his employment with ERCO into "a constitutional right." What for anyone else would be considered a privilege at best has for Greene been enshrouded in constitutional protection. This sleight of hand is too much for me.

But this is not all. After holding that Greene has constitutional protection for his private job, the Court has ordered the President's Cabinet members to revoke their refusal to give Greene access to military secrets.[3] It

---

[1] My brother HARLAN very kindly credits me with "colorful characterization" in stating this as the issue. While I take great pride in authorship, I must say that in this instance I merely agreed with the statement of the issue by the Solicitor General and his co-counsel in five different places in the Brief for the United States. See pp. 2, 17, 19, 29, 59.

[2] ERCO agreed in its government contract, as was well known to Greene, to exclude any individual from any part of its plant at which work under the contract was being performed who had not been cleared by the Navy for access to military secrets.

[3] Brother HARLAN states that I suggest "that the Court's action today requires 'the President's Cabinet members to revoke their refusal to give' the petitioner 'access to military secrets,' despite any views they may have as to his reliability . . . ." Government officials, well versed in the application of this Court's judgments to the practicalities

strikes down the present regulations as being insufficiently authorized by either the President or the Congress because the procedures fail to provide for confrontation or cross-examination at Board hearings. Let us first consider that problem:

## I. THE CONSTITUTIONAL ISSUE.

After full consideration the Court concludes "that in the absence of explicit authorization from either the President or Congress the respondents were not empowered to deprive petitioner of his job in a proceeding in which he was not afforded the safeguards of confrontation and cross-examination." In so doing, as I shall point out, it holds for naught the Executive Orders of both President Roosevelt and President Truman and the directives pursuant thereto of every Cabinet officer connected with our defense since 1942 plus the explicit order of General Dwight D. Eisenhower as Chief of Staff in 1946. In addition, contrary to the Court's conclusion, the Congress was not only fully informed but had itself published the very procedures used in Greene's case.

I believe that the Court is in error in holding, as it must, in order to reach this "authorization" issue, that Greene's "right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference" is protected by the Fifth Amendment. It cites four cases in support of this proposition and says compare four others. As I read those cases not

of government operation, say that the relief which Greene seeks here—and which the Court now grants—is "in substance, a mandatory injunction requiring that the Government show him (or, in practice, allow contractors to show him) defense secrets, notwithstanding the judgment of the executive branch that such disclosure might jeopardize the national safety." Brief for the United States, 48.

one is in point.[4]   In fact, I cannot find a single case in support of the Court's position.   Even a suit for damages on the ground of interference with private contracts does not lie against the Government.   The Congress specifically exempted such suits from the Tort Claims Act.   28 U. S. C. § 2680 (h).   But the action today may have the effect of by-passing that exemption since Greene will now claim, as has Vitarelli, see *Vitarelli* v. *Seaton,* 359 U. S. 535 (1959), reimbursement for his loss of wages.   See *Taylor* v. *McElroy, post,* p. 709.   This will date back to 1953.   His salary at that time was $18,000 a year.

In holding that the Fifth Amendment protects Greene the Court ignores the basic consideration in the case, namely, that no person, save the President, has a constitutional right to access to governmental secrets.   Even though such access is necessary for one to keep a job

---

[4] *Dent* v. *West Virginia,* 129 U. S. 114 (1889), held that a West Virginia statute did not deprive one previously practicing medicine of his rights without due process by requiring him to obtain a license under the Act.   *Schware* v. *Board of Bar Examiners,* 353 U. S. 232 (1957), likewise a license case, did not pass upon the "right" or "privilege" to practice law, merely holding that on the facts the refusal to permit Schware to take the examination was "invidiously discriminatory."   In *Peters* v. *Hobby,* 349 U. S. 331 (1955), the Court simply held the action taken violated the Executive Order involved.   The concurring opinion, DOUGLAS, J., p. 350, went further but alone on the question of "right."   The Court did not discuss that question, much less pass upon it.   *Slochower* v. *Board of Education,* 350 U. S. 551 (1956), held that the summary dismissal without further evidence by New York of a school teacher because he had pleaded the Fifth Amendment before a United States Senate Committee violated due process.   The case merely touched on the "right" to plead the Fifth Amendment, not to "property" rights.   *Truax* v. *Raich,* 239 U. S. 33 (1915); *Allgeyer* v. *Louisiana,* 165 U. S. 578 (1897); and *Powell* v. *Pennsylvania,* 127 U. S. 678 (1888), were equal protection cases wherein discrimination was claimed.   Greene alleges no discrimination.

in private industry, he is still not entitled to the secrets. It matters not if as a consequence he is unable to secure a specific job or loses one he presently enjoys. The simple reason for this conclusion is that he has no constitutional right to the secrets. If access to its secrets is granted by the Government it is entirely permissive and may be revoked at any time. That is all that the Cabinet officers did here. It is done every day in governmental operation. The Court seems to hold that the access granted Greene was for his benefit. It was not. Access was granted to secure for the Government the supplies or services it needed. The contract with ERCO specifically provided for the action taken by the Cabinet officers. Greene as General Manager of ERCO knew of its provisions. If every person working on government contracts has the rights Greene is given here the Government is indeed in a box. But as was said in *Perkins* v. *Lukens Steel Co.*, 310 U. S. 113, 127–128 (1940):

> "Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases. . . . Judicial restraint of those who administer the Government's purchasing would constitute a break with settled judicial practice and a departure into fields hitherto wisely and happily apportioned by the genius of our polity to the administration of another branch of Government."

The Court refuses to pass on the constitutionality of the procedures used in the hearings. It does say that the hearings provided for in the program permit the restraint of "employment opportunities through a denial of clearance without the safeguards of confrontation and cross-examination." I think the Court confuses admin-

istrative action with judicial trials. This Court has long ago and repeatedly approved administrative action where the rights of cross-examination and confrontation were not permitted. *Chicago & Southern Air Lines* v. *Waterman Corp.,* 333 U. S. 103 (1948); *Carlson* v. *Landon,* 342 U. S. 524 (1952); *United States* v. *Nugent,* 346 U. S. 1 (1953); *United States* v. *Reynolds,* 345 U. S. 1 (1953); *Knauff* v. *Shaughnessy,* 338 U. S. 537 (1950); *Shaughnessy* v. *Mezei,* 345 U. S. 206 (1953); and *Jay* v. *Boyd,* 351 U. S. 345 (1956).

At no time since the programs now in vogue were established in 1942 have the rights of cross-examination and confrontation of witnesses been required. In fact the present regulations were patterned after the Employee Loyalty Program, first inaugurated upon the passage of the Hatch Act in 1939, in which the rights of confrontation and cross-examination have never been recognized. Every Attorney General since that time has approved these procedures, as has every President. And it should be noted, though several cases here have attacked the regulations on this ground, this Court has yet to strike them down.[5]

I shall not labor the point further than to say that in my opinion the procedures here do comport with that fairness required of administrative action in the security field. A score of our cases, as I have cited, support me in this position. Not one is to the contrary. And the action of the Court in striking down the program for lack of specific authorization is indeed strange, and hard for me to understand at this critical time of national emergency. The defense establishment should know—and now—whether its program is constitutional and, if not, wherein

---

[5] See *Bailey* v. *Richardson,* 86 U. S. App. D. C. 248, 182 F. 2d 46, affirmed by an equally divided Court, 341 U. S. 918 (1951); *Peters* v. *Hobby,* 349 U. S. 331 (1955).

it is deficient. I am sure that it will remember that in other times of emergency—no more grave than the present—it was permitted, without any hearing whatsoever—much less with confrontation and cross-examination—to remove American citizens from their homes on the West Coast and place them in concentration camps. See *Hirabayashi* v. *United States,* 320 U. S. 81 (1943); *Korematsu* v. *United States,* 323 U. S. 214 (1944). My examination of the Japanese exclusion orders indicates clearly that the Executive Order was a general authorization just as the two here. Congress at the time only created criminal offenses for violation of exclusion or curfew orders of the military commander. Likewise we have criminal statutes here. And while the Japanese orders were in time of war, those involved here had their inception in war and have been continued during the national emergency declared by the President. No one informed in present world affairs would say that our safety is less in jeopardy today. In fact we are now spending nearly as much money to protect it as during the war period. In this light it is inescapable that the existing authorizations are entirely sufficient. Let us examine them.

II. THE PRESIDENT AND THE CONGRESS HAVE GRANTED SUFFICIENT AUTHORITY TO THE CABINET OFFICERS.

Since 1941 the industrial security program has been in operation under express directives from the President. Within a week after the attack on Pearl Harbor, President Roosevelt issued Exec. Order No. 8972, 6 Fed. Reg. 6420, Dec. 12, 1941, which authorized both the Secretary of War and the Secretary of the Navy "to establish and maintain military guards and patrols, *and to take other appropriate measures,* to protect from injury and destruction national-defense material, national-defense premises, and national-defense utilities, . . ." (Emphasis added.)

In 1942, under the authority of that Executive Order, the Secretary of War undertook the formulation and execution of a program of industrial security.[6] The procedures in operation from 1942 and 1943 are outlined in a 1946 publication of the Department of War entitled "Suspension of Subversives from Privately Operated Facilities of Importance to the Security of the Nation's Army and Navy Programs."[7] Interestingly enough, the instructions were issued in time of peace, did not give the suspect a hearing, and were signed by the then Chief of Staff— now President—Dwight D. Eisenhower.

In 1947, the National Security Act, 61 Stat. 495, effected a reorganization of the military departments and placed the Secretary of Defense at the head of the National Military Establishment. Section 305 (a) of the Act transferred to the new organization "[a]ll laws, orders, regulations, and other actions applicable with respect to any function . . . transferred under this Act . . . ." Section 213 created a Munitions Board

---

[6] Report of the Commission on Government Security (1957), S. Doc. No. 64, 85th Cong., 1st Sess. 237, n. 7.

[7] War Department Pamphlet No. 32–4 (1946) provided both criteria and procedures for removal of subversives. The basic criterion was "good cause to suspect an employee of subversive activity . . . ," the latter being defined as "sabotage, espionage, or any other wilful activity intended to disrupt the national defense program." The basic procedure for removal was set out in ¶ 10:

"10. When adequate investigation has revealed that there is good cause to suspect an employee of subversive activity on a national defense project of importance to Army or Navy procurement, the vital success of the project, as well as the security of the loyal employees, may require that the Army or Navy, without revealing the nature or source of its evidence, request the immediate removal of such individual from the project. To this end the cooperation of the organizations representative of organized labor is solicited for the following program: . . ."

Clearly this procedure did not anticipate confrontation or cross-examination.

within the military establishment and under the supervision of the Secretary of Defense. Among its functions were

> "(1) to coordinate the appropriate activities within the National Military Establishment with regard to industrial matters, including procurement . . . plans . . . ; (2) to plan for the military aspects of industrial mobilization; . . . and (10) to perform such other duties as the Secretary of Defense may direct." [8]

In his first report to the President in 1948, Secretary of Defense Forrestal reported that:

> ". . . the Munitions Board is responsible for necessary action to coordinate internal security within the National Military Establishment with regard to industrial matters. This work is being planned and in some phases carried forward by the following programs:
>
> :   .   .   .   .
>
> "c. Development of plans and directives to protect classified armed forces information in the hands of industry from potential enemies;
>
> "d. Establishment of uniform methods of handling of personnel clearances and secrecy agreements . . . ."
>
> First Report of the Secretary of Defense (1948) 102–103.

The forerunner of the exact program now in effect was put in operation in 1948 under the supervision of that Board. And, in the Annual Report to the President, in 1949, the Secretary, then Louis Johnson, reported that

> "*Industrial Security.*—A program to coordinate and develop uniform practices to protect classified mili-

---

[8] The National Security Act Amendments of 1949, 63 Stat. 578, amended § 213 so as to delete subparagraph 10.

tary information placed in the hands of industry under procurement and research contracts was continued by the Munitions Board. Criteria were developed for the granting or denial of personnel and facility clearances in the performance of classified contracts. Work was started to establish a central security clearance register to centralize clearance data for ready reference by all departments and to prevent duplication in making clearance investigations. A joint Personnel Security Board administers this program, and the Industrial Employment Review Board hears appeals from security clearance denials." Second Report of the Secretary of Defense, for the Fiscal Year 1949 (1950), 85.

Transmitted with that report to the President was the Annual Report of the Secretary of the Army, where the number of security cases processed by the Army-Navy-Air Force Personnel Board, and the number of appeals handled by the Industrial Employment Review Board were detailed.[9]

Again in 1950 the Secretary of Defense informed the President, in a report required by law, of the status of the industrial security program.

"In the past 6 months, the Munitions Board activated the Industrial Employment Review Board, established procedures under which the latter will operate, and developed a set of uniform criteria stipulating the circumstances under which security clearances will be denied. The Munitions Board also established a Central Index Security Clearance File to serve as a clearing house for all individual and facility clearances and denials, [and] developed a standard security requirements check list . . . .

---

[9] Annual Report of the Secretary of the Army for the Fiscal Year 1949 (1950), 192.

Uniform standards for security investigations of facility and contractors' personnel are being developed . . . . A standard military security agreement is being coordinated to bind potential suppliers to security regulations before a classified contract is awarded, and a manual to give security guidance to industry is being prepared." Semiannual Report of the Secretary of Defense, July 1 to Dec. 31, 1949 (1950), 97.

The President, in 1953, in Reorganization Plan No. 6, 67 Stat. 638, transferred all of the "functions of the Munitions Board" to the Secretary of Defense and dissolved that Board. Since then the program has been in operation under the authority of the Secretary. Also in 1953, the President issued Exec. Order No. 10450, Apr. 27, 1953, 18 Fed. Reg. 2489, 3 CFR (1949–1953 Comp.), p. 936. That order dealt with the criteria and procedures to be used in the Federal Loyalty Security Program, which had been instituted under Exec. Order No. 9835, 12 Fed. Reg. 1935, 3 CFR (1943–1948 Comp.), p. 630, Mar. 21, 1947. The latter order made clear that federal employees suspected of disloyalty had no right of confrontation.[10] And the regulations promulgated under the order provided no such right. See 13 Fed. Reg. 9365, 5 CFR (1949), § 210, Dec. 31, 1948. These procedures were revised under Exec. Order No. 10450, *supra,* although again, confrontation and cross-examination were not provided. See

---

[10] Part IV, § 2 of Exec. Order No. 9835 specifically stated that: ". . . the investigative agency may refuse to disclose the names of confidential informants, provided it furnishes sufficient information about such informants on the basis of which the requesting department or agency can make an adequate evaluation of the information furnished by them, and provided it advises the requesting department or agency in writing that it is essential to the protection of the informants or to the investigation of other cases that the identity of the informants not be revealed. . . ."

19 Fed. Reg. 1503, 32 CFR, p. 288, Mar. 19, 1954. Thus, it was clear that the President had not contemplated that there would be a right of confrontation in the Federal Loyalty Security Program. And the report of the Secretary of the Army—transmitted to the President by the Secretary of Defense—made clear that the criteria of Exec. Order No. 10450 were being utilized not only where the loyalty of a government employee was in doubt, but also in carrying out the industrial security program. Semiannual Report of the Secretary of the Army, Jan. 1, 1954, to June 30, 1954, 135–136.

Thus we see that the program has for 18 years been carried on under the express authority of the President, and has been regularly reported to him by his highest Cabinet officers. How the Court can say, despite these facts, that the President has not sufficiently authorized the program is beyond me, unless the Court means that it is necessary for the President to write out the Industrial Security Manual in his own hand.

Furthermore, I think Congress has sufficiently authorized the program, as it has been kept fully aware of its development and has appropriated money to support it. During the formative period of the program, 1949–1951, the Congress, through appropriation hearings, was kept fully informed as to the activity. In 1949 D. F. Carpenter, Chairman of the Munitions Board, appeared before a Subcommittee of the House Committee on Appropriations to testify concerning the requested appropriation for the Board. While the report indicates much of the testimony was "off the record," it does contain specific references to the program here under attack.[11] Significantly the appropriation bill for 1950 included an item

---

[11] House of Representatives, Hearings before the Subcommittee of the Committee on Appropriations on the National Military Establishment Appropriation Bill for 1950, 81st Cong., 1st Sess. 91.

of $11,300,000 for the maintenance, *inter alia,* of the Board.

Again, in 1950 General Timberlake, a member of the Board, testified:

> "Then we are going to intensify the industrial mobilization planning within the Department of Defense, with particular emphasis on industrial security . . . ." House of Representatives, Hearings before a Subcommittee of the Committee on Appropriations on the Supplemental Appropriation for 1951, 81st Cong., 2d Sess. 264.

While, again, some of the testimony was "off the record" it was sufficiently urgent and detailed for the Congress to appropriate additional funds for the Board for 1951.[12]

By the 1953 Reorganization Plan, the functions of the Munitions Board were transferred to various Assistant Secretaries of Defense. The industrial security program was put under the Assistant Secretary of Defense for Manpower, Personnel, and Reserve Forces. Of course, this office received an appropriation each year. These hearings, to cite but two, certainly indicate an awareness

---

[12] The reason for the dearth of legislative reference to the program appears in some 1955 hearings on an appropriation bill. Under consideration at the time was a proposal for a fund to reimburse contractor employees who had been suspended during a security check and subsequently cleared. General Moore testified that, in the past, such reimbursement had been made by the service secretaries out of their contingency funds. Then followed this colloquy:

"Mr. Mahon. Under that [the contingency fund] you can buy a boy a top, or a toy, provided the Secretary of Defense thinks it is proper?

"Gen. Moore. That is right, and we come down here and explain to this committee with respect to this in a very secret session how much we have spent and precisely what we have spent it for." House of Representatives, Hearings before the Subcommittee of the Committee on Appropriations on Department of Defense Appropriations for 1956, 84th Cong., 1st Sess. 780.

on the part of Congress of the existence of the industrial security program, and the continued appropriations hardly bespeak an unwillingness on the part of Congress that it be carried on. In 1955, the Eighty-fourth Congress, on the motion of Senator Wiley for unanimous consent, caused to be printed the so-called Internal Security Manual, S. Doc. No. 40, 84th Cong., 1st Sess. It is a compilation of all laws, regulations, and congressional committees relating to the national security. Contained in the volume is the "Industrial Personnel Security Review Regulation," *i. e.*, a verbatim copy of the regulations set up by the Secretary of Defense on February 2, 1955. This Manual outlined in detail the hearing procedures which are here condemned by the Court. And it is important to note that the final denial of Greene's clearance was by a Board acting under these very regulations. Still not one voice was raised either within or without the Halls of Congress that the Defense Department had exceeded its authority or that contractor employees were being denied their constitutional rights. In other cases we have held that the inaction of the Congress, in circumstances much less specific than here, was a clear ratification of a program as it was then being carried out by the Executive. Why, I ask, do we not do that here where it is so vital? We should not be "that blind Court . . . that does not see what '[a]ll others can see and understand . . . .' " *United States* v. *Rumely,* 345 U. S. 41, 44 (1953).

While it certainly is not clear to me, I suppose that the present fastidiousness of the Court can be satisfied by the President's incorporating the present industrial security program into a specific Executive Order or the Congress' placing it on the statute books. To me this seems entirely superfluous in light of the clear authorization presently existing in the Cabinet officers. It also subjects the Government to multitudinous actions—and perhaps large

damages—by reason of discharges made pursuant to the present procedures.

And I might add a *nota bene.* Even if the Cabinet officers are given this specific direction, the opinion today, by dealing so copiously with the constitutional issues, puts a cloud over both the Employee Loyalty Program and the one here under attack. Neither requires that hearings afford confrontation or cross-examination. While the Court disclaims deciding this constitutional question, no one reading the opinion will doubt that the explicit language of its broad sweep speaks in prophecy. Let us hope that the winds may change. If they do not the present temporary debacle will turn into a rout of our internal security.