**Albert T. GOADBY**

v.

**PHILADELPHIA ELECTRIC et al.**

**Civ. A. No. 80–2759.**

United States District Court,
E. D. Pennsylvania.

Oct. 2, 1980.

Joseph Romano, Ronald I. Rosenstein, Norristown, Pa., for plaintiff.

R. A. Swift, Kohn, Savett, Marion & Graf, Philadelphia, Pa., for PEC.

Larry Goesoff, Harrisburg, Pa., for Public Utility Commission.

Elizabeth Shuster, Pa. Dept. of Justice, Harrisburg, Pa., for defendants.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

### Findings of Fact

Plaintiff Albert T. Goadby is the owner of certain premises located at R.D. # 1 in Pennsburg, Upper Hanover Township, Montgomery County, Pennsylvania. Plaintiff resides in a house on that property. He first purchased two parcels of his present property in 1957. He purchased a third parcel in 1963. This third parcel of land is located in Upper Hanover Township. Mr. Goadby has occupied his property since 1957, at first in a mobile home, and since then he has worked, with intermittant periods of delay, on his house. In the Spring of 1971, plaintiff was approached by employees of Philadelphia Electric Company who told him that a 500,000 volt electric transmission line was being planned, and that the path of the line would cross his property. Plaintiff at that point expressed his objection to the condemnation of his property. Plaintiff moved into his new house in December of 1979.

Plaintiff's land consists of 3.04 acres of woodland intersected by an existing Pennsylvania Power and Light 230,000 volt transmission line. Plaintiff acquired his

land subject to an easement granted by his predecessor in title to the Pennsylvania Power and Light Company for the purpose of operating said 230 kilovolt transmission line.

1. Plaintiff testified that he has been shocked by currents in his mobile home and in the garage of his house. Plaintiff testified that Philadelphia Electric inspectors visited his property and that their conclusion was that his electrical systems were not properly grounded. The Court finds the testimony inconclusive on this point.

2. Defendant, Philadelphia Electric Company (PECO) is a public utility corporation in part regulated by co-defendant, the Pennsylvania Public Utility Commission (PUC). PECO's board of directors resolved on December 26, 1973 to appropriate a 150 foot-wide right-of-way across plaintiff's land for the purposes of suspending a 500 kilovolt transmission line. The proposed right-of-way would run parallel and adjacent to the existing Pennsylvania Power and Light transmission line on the side away from plaintiff's house. (Exs. P = 1 and P = 17).

3. PECO considers the line necessary for two reasons: to provide cheaper coal-generated electricity to the Eastern regions of the power grid served by PECO, and to minimize the risk of power failures by increasing the capacity within the power system for the exchange of emergency supplies with other systems. Plaintiff's Chief Systems Design Engineer testified that the cost to PECO of delaying construction of the Elroy-Hosensack line after October 15 will be approximately $350,000 per week for the first month of delay and $275,000 per week in each successive month thereafter.

4. On April 2, 1979, PECO's application for a Certificate of Public Convenience was heard before an examiner of the PUC. Plaintiff testified at that hearing and was represented by counsel. At that hearing, plaintiff cross-examined defendant PECO's chief system planning engineer, Emil Kasum, and PECO's supervising engineer in the Transmission Project Branch of the Transmission and Distribution Engineering Section, Harry E. Gerhart. No testimony was heard concerning the safety of the proposed line, other than testimony about the height of the transmission lines. (P-2).

5. On or about April 4, 1979, PECO responded to interrogatories issued by Franconia Township, which opposed the line, regarding the proposed Elroy-Hosensack power line. Answers to these interrogatories contained summaries of calculations estimating the strength of an electro-magnetic field generated by a 500 kilovolt transmission line and a 230 kilovolt line located parallel to one another. Interrogatory 8 inquired, "What biological changes, if any, will be induced in a person exposed to the electric field of the proposed 500 kv transmission line?" PECO's answer was that it knew of no instances of such effects. PECO cited a Department of Energy study relating to a 500 kilovolt line in Minnesota that concluded that "there was no convincing demonstration of dangerous biological effects from low level electrical fields." (D-PE = 12 at p. 10). Interrogatory 10 asked about biological changes that would be induced by exposure to a magnetic field of the anticipated strength. PECO responded by stating that it had no experience with any such effects, and that in hearings relating to a proposed 765 kilovolt line in New York, an administrative law judge concluded "that exposure to the magnetic fields of lines would not be hazardous." PECO cited as its source material, an Opinion of the New York Public Service Commission. PECO also stated that its own experience formed the basis for its assertion that it had "no knowledge of any biological consequences or claims of same, attributable to transmission line radiation." (Ex. D PE = 12, at p. 13). These answers were received by the PUC on April 6, 1979.

6. On June 28, 1979, the Public Utility Commission heard testimony regarding PECO's application for authorization to build the proposed line. At that hearing, before Sheldon W. Farber, administrative law judge, Thomas A. Wakely, Jr., Project Engineer for PECO, testified as to the safety of the line. Regarding the electro-mag-

netic field generated by the proposed line Mr. Wakely testified, "There will be an electrical field produced under the line and a very slight magnetic field produced under the line. They will be low enough that you won't notice them, and we don't expect any harmful effects from them." (Ex. D–PE # 13 at p. 43). Later in his testimony, Mr. Wakely said, "Some phasing configurations are worse than others. My worst situation, where the 500 and 230 line parallel is under code condition, [is] 7.49 . . . KV per meter." (Ex. D–PE 13 at p. 54). Mr. Goadby was not a party to this hearing, and no evidence has been adduced to show that he was notified about it.

7. On November 2, 1979, administrative law judge Farber issued an Initial Decision Granting Approval and Authorization to Locate a 500 KV Electric Transmission Line (Elroy–Hosensack). In that Opinion, Judge Farber found that "Both the ground level electric field and the magnetic flux density of the line, using the most extreme theoretical conditions, are well below threshold danger levels." (Ex. D–PE = 11 at p. 5 and p. 9). Administrative law judge Farber found that an electromagnetic field reaching a strength of 7.49 Kv per meter was "within acceptable limits." (Ex. D–PE = 11 at p. 9).

8. On December 21, 1979, at a public meeting held in Harrisburg, Pennsylvania, the Public Utility Commission adopted the decision of administrative law judge Farber and granted PECO's application to site, build, and operate the Elroy–Hosensack Line. The Order was entered January 16, 1980.

9. On May 13, 1980, plaintiff filed suit in Montgomery County Court of Common Pleas, alleging that PECO had acted in violation of Pennsylvania law. Plaintiff's motion for a preliminary injunction was denied and plaintiff's complaint was dismissed.

10. Plaintiff's application for supersedeas was denied in a Memorandum Opinion of Judge Blatt of the Commonwealth Court filed June 23, 1980. Judge Blatt found that plaintiff had failed to show that the harm that would result from PECO's construction of the line was outweighed by the public's and PECO's need for the line.

11. On July 1, 1980, a complaint was filed in this Court by plaintiff, and on July 4, 1980, plaintiff moved for a temporary restraining order. Judge Huyett, sitting as emergency judge, denied that motion and a similar, renewed motion. Plaintiff appealed Judge Huyett's Order, alleging that it was a denial of a preliminary injunction motion, and that motion on appeal to the Court of Appeals was denied.

12. On September 28 and 29, 1980, this Court heard testimony of plaintiff and defendants regarding the history of this case and, most importantly, the evidence regarding the safety of the proposed Elroy–Hosensack Line. Testifying for plaintiff was Dr. Andrew Marino, a researcher in biophysics, whose primary orientation is toward the effects of electro–magnetic radiation on living creatures. He is also involved in research related to the use of low voltage currents in orthopedic medicine. The Court permitted Dr. Marino to testify as an expert and heard his opinions on the effects of low level electro–magnetic radiation on living organisms. This Court finds Dr. Marino's opinions and hypotheses persuasive and credible. At most, defendants' cross–examination of Dr. Marino showed that there is disagreement in the academic community about the conclusions that can be drawn from studies made of the effect of low level radiation. Dr. Marino estimated that the electro–magnetic field generated by the "typical" 500 Kv transmission line would be as strong as 4 to 9 kilovolts per meter directly under the transmission line, and perhaps 1,000 volts per meter in the vicinity of plaintiff's house. Dr. Marino's opinion was that this exposure, which would be of a constant duration, posed a health hazard to plaintiff.

Defendants' witness, John Gillespie, who is the Supervising Engineer in PECO's Electric Engineering Department, provided the Court with a computer run of calculations–similar in theory to Dr. Marino's, but with the benefit of precise measurements

816

regarding the geometry of the proposed line and the existing 230 Kv line. (Ex. D–PE = 16). Mr. Gillespie's calculations show a maximum field strength of 3,030 volts per meter, at a point in a plane intersecting the transmission line at right angles, 133 feet away from the line in the direction of the Goadby house and approximately 70 feet therefrom. Directly beneath the proposed line, Mr. Gillespie calculated, the field strength would be 630 volts per meter. At 203 feet from the proposed line–that is, at the Goadby house, the field strength would be 390 volts per meter. Mr. Gillespie explained the contradiction between this estimate and the estimates provided Franconia Township–which were stated to be within a range of 4,480 volts per meter and 7,480 volts per meter–by showing that the calculations were affected by the height of the wires. The estimates given Franconia Township were based on the assumption that the wires would be 40 feet above the ground. Mr. Gillespie's calculations postulate that the Elroy–Hosensack lines will be 76 feet from the ground.

In reply to Dr. Marino, defendants called Dr. Morton Miller, a researcher in biophysics who is a professor of radiation biology. Dr. Miller has undertaken studies for the FDA and the Department of Energy on the subject of electric field radiation and ultra sound radiation. Dr. Miller was permitted to testify as an expert. At the outset, Dr. Miller asserted that he would *not* state that the proposed line presented no risk of a health hazard. Rather, Dr. Miller said there is not an unreasonable risk. Dr. Miller's subsequent testimony further elucidated the disagreement in the academic community. Dr. Miller's conclusion (based on his research and his analysis of the same studies used by Dr. Marino) was the following: biological perturbation occurs as an effect of electric radiation *only* above a strength of 300 volts per meter. Dr. Miller stated that 300 volts per meter cannot be introduced to an organism through an airfield, and, in any event, 300 volts per meter could not be introduced to a human being by the Elroy–Hosensack aerial suspension lines. In sum, Dr. Miller's syllogism concludes that the Elroy–Hosensack Line cannot cause biological perturbation.

It is not necessary, for purposes of this hearing, for this Court to choose between the different analyses offered here by scientists and engineers. It is sufficient, for the purposes that will be explained below, to find, as we do here, that Dr. Marino's testimony is persuasive. This is not the proper body to decide at this time the extent of its persuasiveness, but enough truth is self–evident that we can find that his conclusions rise above a certain threshold of credibility.

13. Plaintiff first learned of the possible effects of low level electro–magnetic fields generated by high voltage transmission lines when he read an article about it in a 1980 issue of *Reader's Digest* magazine.

*Conclusions of Law*

In order to issue a preliminary injunction, the Court must be satisfied that plaintiff has established: (1) a reasonable likelihood of success on the merits; (2) irreparable harm to the plaintiff, absent such an injunction; (3) absence of harm to the defendant; and (4) absence of harm to the public interest. *Winkelman v. New York Stock Exchange*, 445 F.2d 786, 789 (3d Cir. 1971). The first aspect, likelihood of success on the merits, will be considered first.

Plaintiff claims that PECO has acted in concert with the PUC, in violation of the due process clause of the 14th Amendment, and that plaintiff will prevail in an action under 42 U.S.C. § 1983. Plaintiff's causes of action include allegations that PECO *unconstitutionally* elected to proceed under the Business Corporation Law rather than under the Eminent Domain Code. Plaintiff gives several reasons for this conclusion: (1) Defendants denied plaintiff the full range of rights available under the Eminent Domain Code; (2) defendants are taking a de facto fee rather than a right–of–way; or (3) defendants are taking a profit a prendre. These claims are utterly without merit.

Plaintiff also claims that he has been foreclosed from a hearing of his objections

to this taking. Insofar as this claim is predicated on plaintiff's assertion that he has had no forum in which to challenge the legality of the power to take exercised by PECO and the PUC, this claim is without merit. Plaintiff's claims were heard and considered in Montgomery County Court and are now on appeal. However, insofar as this claim reflects the meaninglessness of plaintiff's opportunity to challenge the scope of the *actual* taking involved in this case, the Court finds that his case has substantial merit.

This Court has heard credible testimony that shows a distinct possibility that the easement taken by PECO may in fact and in effect be considerably larger than 150 feet wide. As noted above, plaintiff errs when he states that defendants will take a larger estate than they have claimed, for defendants will be taking only a right of way. But by virtue of the apparent encroachment of possibly harmful electromagnetic waves, the taking here may be twice or three times as broad in physical scope as revealed by PECO.

It is settled law that a condemnee shall be compensated for damage to his remaining property that is the direct result of the initial condemnation, *see* Article 1, section 10 of the Pennsylvania Constitution and Section 502(e) of the Pennsylvania Eminent Domain Code. If the electromagnetic field is indeed harmful, and plaintiff's use and enjoyment of his property is indeed curtailed by the amount of land covered by significant amounts of electric radiation—has his property not been damaged? This Court does not hold here today that such will occur. This Court holds instead that plaintiff was denied the opportunity to *prove* that such would occur, and that in that denial, plaintiff's right to challenge the scope of the taking was vitiated.

■ To begin at the beginning, plaintiff is entitled to just compensation for any land taken from him—be that taking in the form of a fee or a right-of-way. This guarantee is contained in both the United States and the Pennsylvania Constitutions. Plaintiff is also entitled to due process of

law in the act of that taking. A necessary element of due process is that plaintiff be given an opportunity fully and fairly to make out his claims—in this instance, against a public utility. Of course, if the taker conceals or fails to disclose the true extent of the taking, then all subsequent hearings or findings are a sham. As Chief Justice Earl Warren wrote in another context:

> Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.

*Greene v. McElroy*, 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959). Another Chief Justice, Charles Evans Hughes said:

> The right to a hearing embraces not only the right to present evidence, but also a reasonable opportunity to know the claims of the opposing party and to meet them. The right to submit argument implies that opportunity; otherwise the right may be but a barren one. Those who are brought into contest with the government in a quasi-judicial proceeding aimed at the control of their activities are entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its final command.

*Morgan v. United States*, 304 U.S. 1, 18–19, 58 S.Ct. 773, 776–77, 82 L.Ed. 1129 (1938).

When Albert Goadby was heard before the Public Utility Commission, was the evidence used to prove the utility's case disclosed to him? Was he fairly advised of what the utility proposed to do? The answers to those questions requires resolution of the following issue: Was the proposed taking of a right-of-way indeed a 150 foot strip that would cover only a little more than six-tenths of an acre of plaintiff's land? For the reasons given below, this Court concludes that those dimensions *may*

have been a misstatement, and that both PECO and the PUC *knew* or should have known as much, and that Albert Goadby was entitled to try to prove that the scope of the right–of–way sought was greater than stated by PECO. Because he was not informed of the nature of the taking, he was not alerted to make such arguments, and the hearings on his claims were meaningless.

Under Pennsylvania law "when the entity clothed with the power of eminent domain substantially deprives an owner of the beneficial use and enjoyment of his property" there is a "de facto taking." *Griggs v. Allegheny County*, 402 Pa. 411, 414, 168 A.2d 123, 124 (1961) *reversed on other grounds*, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962). *See* Section 502(e) of the Eminent Domain Code, 26 P.S. § 1–502(e) (Supp.1974–75); *Cf. Commonwealth, Department of Transportation v. Township of Palmer*, 329 A.2d 871, 873 note 4 (1979). The Pennsylvania Supreme Court has held *"whenever the lawful rights of an individual to the possession, use or enjoyment of his land are in any degree abridged or destroyed by reason of the exercise of the power of eminent domain, his property is pro tanto taken, and he is entitled to compensation." Miller v. Beaver Falls*, 368 Pa. 189, 196–97, 82 A.2d 34 (1951). [Emphasis in original].

█ We have heard testimony that plaintiff's land may be taken to a larger extent than he was told. At the very least, he deserved a forum in which to state a claim regarding the scope of the taking or the amount of damage to his interests for which he would be entitled to just compensation. Because plaintiff was denied that opportunity, this Court concludes that he has a reasonable likelihood of success on the merits in his claim against defendants, both under Section 1983 and under the 14th Amendment.

This Court must also inquire into the nature of irreparable harm asserted by plaintiff, and the likelihood of significant harm to defendants should the injunction issue. The Court of Appeals has mandated that the district courts engage in a "delicate balancing" of all the elements required for a preliminary injunction, *Constructors Association of Western Pennsylvania v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978). While this Court performs that feat, it is mindful of the equities present here. Plaintiff is not a wealthy man–his land is his only valuable asset. Defendants propose to raze his trees on approximately 20% of his land, and to suspend overhead high voltage transmission lines. They will do so, having failed to reveal to plaintiff the possible nature of the injury he is to endure. Defendants, on the other hand, will lose nothing until October 15. At that point, their losses will indeed be substantial, but now they are warned well ahead of time, and may make arrangements to best mitigate their losses. Because of the terms of the relief this Court will grant, it finds that the claimed loss to defendants can be mitigated. Finally, the Court must consider the public. It is true that electricity rates may be affected to a miniscule degree, and, temporarily, there will be greater risk of power shortages. But this Court cannot conclude that the public is well served by a ruling that would contribute to the diminution of its rights. This is not a contract action where the Court must decide the relative contractual rights and commercial strengths of individual litigants. We are considering here the fundamental rights of citizens to be secure from arbitrary government action. Surely the interests of the public are better served by the protection of its basic liberties than by a callous sacrifice of the rights of one for the marginal convenience of many.

█ Having made these findings, and these observations, the Court will hereby order that Philadelphia Electric Company is enjoined from entering upon the land of Albert Goadby until such time as he has been heard in the appropriate administrative hearing of the Public Utility Commission to state his claims regarding the encroachment of an electro–magnetic field upon his land by the proposed Elroy–Hosensack transmission line–*or* his claims have been heard in this Court.