NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

07-901

STATE OF LOUISIANA

VERSUS

JIM VAN NGUYEN

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 39344
HONORABLE KRISTIAN DENNIS EARLES, DISTRICT JUDGE

**********

ELIZABETH A. PICKETT
JUDGE

**********

Court composed of Jimmie C. Peters, Elizabeth A. Pickett, and Billy Howard Ezell, Judges.

AFFIRMED AND REMANDED WITH INSTRUCTIONS.

John Harvey Craft
Louisiana Appellate Project
2529 Danbury Dr.
New Orleans, LA 70114
Counsel for Defendant-Appellant:
Jim Van Nguyen

Michael Harson
District Attorney, 15th JDC
Ted Ayo
Assistant District Attorney
P.O. Box 3306
Lafayette, LA 70502-3306
Counsel for State-Appellee:
State of Louisiana

**PICKETT, Judge.**

## FACTS

On September 19, 2002, the defendant, Jim Van Nguyen, was indicted with two counts of first degree murder of Thang D. Nguyen and Thuan Joseph Nguyen. Following a trial by jury, the defendant was convicted as charged on October 28, 2006. On October 29, 2006, the defendant was sentenced to serve life in prison on each count, without benefit of probation, parole or suspension of sentence, the sentences to run consecutively to each other. The defendant is now before this court on appeal, asserting that the trial court erred in sustaining the state's objections to the defendant's impeachment of a state witness on the basis of the attorney-client relationship between the witness and the prosecutor.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there is one error patent.

The record does not indicate that the trial court advised the defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Thus, the trial court is directed to inform the defendant of the provisions of Article 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of its opinion, and to file written proof that the defendant received the notice in the record of the proceedings. *See State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

1

## ASSIGNMENT OF ERROR

In his sole assignment of error, the defendant argues that the trial court erred in sustaining the state's objections to the defendant's impeachment of a state witness, Phoung Bui. More specifically, the defendant maintains that an attorney-client relationship existed between Phoung, a witness for the state who was an accomplice in the case, and the prosecutor for the state, Ted Ayo. Counsel for the defendant asserts that she was making a legitimate effort to expose to the jury that Phoung had an interest in furthering his relationship with Mr. Ayo that colored his credibility at trial.

The defendant admits that the propriety of Mr. Ayo's dealings with Phoung and his family are not at issue in the current proceeding, but asserts that Phoung's state of mind as a result of same was in question. The defendant argues that it is impossible to characterize the situation as orthodox and that the ability to fully cross-examine an adverse witness is part and parcel of the Sixth Amendment right to confrontation.

In support of his argument, the defendant refers this court to *State v. Nash*, 475 So.2d 752 (La.1985), wherein the supreme court rejected the trial court's limitation of the cross-examination of a cooperating witness on parole. The court discussed the right to confrontation as follows:

> The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." This right is secured for defendants in state as well as federal criminal proceedings under *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) and by art. 1, § 16 of the 1974 Louisiana Constitution. Confrontation means more than being allowed to confront the witnesses physically; a primary interest secured by it is the right of cross-examination. *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1109, 39 L.Ed.2d 347 (1974); La. Const.1974, art. 1, § 16; 5 J. Wigmore, Evidence § 1395, p. 23 (3d ed. 1940).

The cross-examiner is not only permitted to delve into the witness's story to test the witness's perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness. . . .A more particular attack on the witness's credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices or ulterior motives of the witness as they may relate to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial and is always relevant as discrediting the witness and affecting the weight of his testimony. *Davis v. Alaska, supra*, 415 U.S. at 316, 94 S.Ct. at 1110; 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970). The exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross examination. *Davis v. Alaska, supra*; *Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959).

*Id*. at 754-55.

The defendant asserts that Phoung entered a plea agreement that spared him full exposure to the penalties for murder and that Phoung's desire to receive the benefit from same was a proper theme for cross-examination. Further, the defendant contends that the nature of Phoung's family and his personal dealings with Mr. Ayo, the prosecutor who offered Phoung the plea bargain, could not be ignored by any competent cross-examiner and that restricting cross-examination regarding same restricted the defendant's right to confrontation.

In response to the defendant's argument, Mr. Ayo, on behalf of the state, sets forth his version of the facts concerning his civil legal involvement with Phoung and/or his family. We note that the facts set forth in his brief are not a part of the record and we are unable to find documentation therein to support or dispute the allegations as stated by Mr. Ayo.

In Mr. Ayo's brief to this court on behalf of the state, he sets forth the following facts. First, Mr. Ayo asserts that Phoung's mother, Nga Thi Vu, was killed in a two-car accident on August 2, 2002. The driver of the other vehicle, Louella

3

David Cosper, consulted with Mr. Ayo following the accident and sought his services in the event she was sued by Nga Thi Vu's family as a result of Mrs. Cosper's fault in causing the accident. Mr. Ayo states that Farm Bureau Insurance Company (Farm Bureau) agreed to pay Mrs. Cosper's policy limits of $100,000.00 to the Bui family and that he forwarded the correspondence reflecting their agreement to Ba Nguyen Bui, Phoung's father and the spouse of his deceased mother. According to Mr. Ayo, Mr. Bui showed up at Mr. Ayo's office and was advised by Mr. Ayo that he had already been retained by Mrs. Cosper in the event that suit was filed and that he could not represent Ba Nquyen Bui and his family. Ba Nguyen Bui subsequently advised Mr. Ayo that he and his family would accept the policy limits as a complete settlement, and the check and release were mailed to Mr. Ayo's office and executed on September 27, 2002.

Next, Mr. Ayo states that because Mrs. Cosper wanted to do more for the family of the deceased, she requested that Mr. Ayo open a succession and institute tutorship proceedings for the minor children which was done as requested, at Mrs. Cosper's expense. Mr. Ayo maintains that he did not receive a fee from Phoung's family, nor did he represent Phoung's family in the civil matter.

Again, these facts are neither supported nor disputed by the record. At the beginning of defense counsel's cross-examination of Phoung, Phoung was asked if he knew Mr. Ayo. Phoung responded affirmatively and stated that Mr. Ayo represented his deceased mother, himself, his brothers and his father. Phoung also testified that Mr. Ayo represented him a few years ago for an accident. No other facts or details regarding same were elicited at trial.

4

Toward the conclusion of an extensive cross-examination regarding the facts of the case and Phoung's credibility, defense counsel questioned Phoung regarding the death of his mother in an automobile accident and asked if he and his father went to Mr. Ayo. Phoung objected to the line of questioning, asking what it had to do with the trial and stating that he did not want to talk about his mother at that time. Phoung was subsequently instructed by defense counsel not to direct any more questions to defense counsel.

A sidebar discussion was held and, the trial court questioned Mr. Ayo about his objection as follows:

MR. PUTNAM: Can we come side bar?[1]

THE COURT: Yes.

[SIDEBAR DISCUSSION]

THE COURT: And your objection?

MR. AYO: Ms. Thomas, forget about what we stipulated to, the whole motion goes in now because that has no relevancy to these proceedings and you know it damn good and well.

MS. THOMAS: It certainly does. I'm attacking the credibility of this witness.

THE COURT: How does that have to do with anything about --

MR. AYO: How does it have to do with --

MS. THOMAS: Because he thinks he was going to get a better deal if he went to Ted, and he thinks he was going to get a --

MR. AYO: He didn't come to Ted. His dad came to Ted. He didn't come to Ted; his dad came to Ted.

MS. THOMAS: Well, how do I know -- I mean, did you know his daddy before? Why did his daddy choose you because he --

---

[1]Richard Putnam, III is an assistant district attorney and served as co-counsel for the State during the trial.

5

MR. AYO: We're going to put everything in the record from David Mane's trial, then, so that the jury fully understands. We're going to put your proceeding in where you questioned me and thought if I did anything inappropriate and you said "no," all of that goes in the record.

MS. THOMAS: There is no record of that I don't think.

MR. AYO: There is to, I've got the transcript, sweetheart.

THE COURT: Well, are you going to continue to go down that road?

MS. THOMAS: I didn't say you did anything wrong, Ted. I've always said you didn't do anything wrong. I'm saying it's what he thought.

MR. AYO: He didn't come to me, Pat. His dad came to me is what I'm telling you.

MS. THOMAS: But still, Ted, I told you I thought it was stupid to do it. You went ahead and did it. You knew who the players were. You knew Phou [sic] was in the mix. You knew Phou [sic] was a suspect, and you went ahead and did the tutorship.

MR. AYO: That has nothing to do with the relevancy of this.

THE COURT: I don't think that is relevant to the proceedings today.

MR. AYO: Nothing to do with these proceedings.

MS. THOMAS: Okay. You tell me it's not relevant, then I'll -- you sustain his objection?

THE COURT: I'll sustain his objection.

MS. THOMAS: Mr. Putnam's objection was sustained, Your Honor?

THE COURT: That's correct.

MS. THOMAS: Thank you.

At the conclusion of Phoung's testimony, the defendant made a proffer of the succession documents of Phoung's mother and tutorship of the deceased's minor children, which included Phoung. The Petition for Possession, prepared by Mr. Ayo

6

and submitted for filing on September 30, 2002, was that of Ba Nguyen Bui, surviving spouse of the decedent, Phoung Vu Bui, Nguyen Vu Bui, major children of the decedent, and Phoung Nim Bui, Chi Kuin Bui and Tai Vu Bui, minor children of the decedent.

The tutorship documents submitted in the proffer includes a Petition for Qualification as Natural Tutor and for Appointment of Undertutor filed by Ba Nguyen Bui, seeking to be appointed as tutor of the minor children to make a demand upon Mrs. Cosper and Farm Bureau for damages sustained by the decedent. The document specifically states that an agreement had been reached to compromise the Buis' claim against Mrs. Cosper and Farm Bureau, and therefore, it was necessary that Ba Nguyen Bui be qualified as natural tutor of the minor children and that Dung Thi Bui be appointed as undertutrix to represent the minors in the settlement. This document was also prepared by Mr. Ayo and submitted for filing on September 30, 2002. Lastly, a Petition for Authority to Compromise Minors' Claim filed by Ba Nguyen Bui was prepared and submitted for filing by Mr. Ayo on September 30, 2002.

As noted above, the facts as stated by Mr. Ayo in his brief are not found in the record. The defendant's proffer, however, does reflect that Mr. Ayo was involved in the preparation of documents for the succession of Phoung's mother and the appointment of his father for the purpose of settling a civil claim against Mrs. Cosper and Farm Bureau. These documents, however, do not indicate that Mr. Ayo had any personal involvement with Phoung in the drafting and filing of these documents or provide the extent or details of any relationship between Mr. Ayo and Phoung.

7

Additionally, at the time of the defendant's objection, the parties make reference to a discussion had at a co-defendant's trial, David Manes, involving Mr. Ayo's civil involvement with Phoung. Although the parties discussed submitting a portion of the transcript from David Mane's trial into evidence, neither party submitted the transcript, and thus, the information contained therein is not in the instant record for this court to review. In summary, we find that the defendant failed to create a record for this court to review and to determine whether the trial court violated the defendant's right to confront Phoung on cross-examination.

Assuming that the proffer is sufficient evidence to show that Phoung had an interest in furthering his relationship with Mr. Ayo that colored his credibility at trial, we find that the trial court's ruling was harmless error. In *State v. Robinson*, 01-273, pp. 9-10 (La. 5/17/02), 817 So.2d 1131, 1137, the supreme court stated:

> Confrontation errors are subject to a *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) harmless error analysis. *See Delaware v. Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438; *State v. Hawkins*, 96-0766 (La.1/14/97), 688 So.2d 473, 478; *State v. Wille*, 559 So.2d 1321, 1332 (La.1990).
>
> > The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.
>
> *Delaware v. Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438.

In the instant case, the defendant stresses that Phoung's testimony was crucial to the state's case in that he admitted to participating in the preparation of the killings, the killings themselves and in disposal of incriminating evidence. However, the state presented a number of witnesses, included co-defendants and accomplices, to prove its case that the defendant committed first degree murder.

First, the most crucial testimony linking the defendant to the murders was that of co-defendant, Jason Manes. Jason Manes had an agreement with the state to testify at the defendant's trial in exchange for his plea of guilty to one count of manslaughter, with a sentence of eight years at hard labor, without benefit of probation, parole or suspension of sentence, and to one count of obstruction of justice in a first degree murder case, with a sentence of twelve years at hard labor, suspended, with five years active supervised probation. The sentence was to run consecutive to his sentence for manslaughter. The agreement also included any proceedings, grand jury inquiries and /or trials of his brother, David Manes, Phoung Bui, Michelle Hong, Ben Thompson and Cade Thompson.

Jason's testimony at trial indicated that he was the driver in the organized plan to kill the victims. Jason testified that on the day of murders, he saw the defendant, Phoung, Michelle Hong and David Manes, his brother, in the living room of his father's home. According to Jason, David and the defendant were loading guns and polishing bullets. At first he thought nothing of their activity because they were hunters. The conversation, however, indicated otherwise, and Jason realized that something else was going to happen, i.e., a plan to steal from someone or beat someone. Jason stated that they were talking about meeting somewhere and that they had two shotguns and a Luger or a TEC 9.

9

Next, Jason testified that the defendant told David that it would be better for Jason to drive their father's truck. David agreed and Jason followed along. When they got ready to leave, Jason was in the driver's seat while David was in the passenger's seat with a shotgun on his lap. The defendant then passed the TEC 9 through the window, put it in Jason's lap with a towel and told him not to touch it. Another loaded shotgun was behind the driver's seat. Jason and David proceeded to Etienne Road, while the defendant got into a car with Phoung, the driver, and Michelle, and they traveled to a different destination.

Upon reaching a dark wooded area, Jason stated that he and David parked and David got out of the truck, disappeared into the dark and they waited. Next, two cars pulled up behind Jason. The defendant got out of the car driven by Phoung and walked to the side of the truck carrying a bag of drugs. Jason testified that the gun was still in his lap and the defendant began to "fiddle" with it, possibly turning it off of safety. The defendant put the gun back on Jason's lap and walked away from the truck toward the other car. The defendant yelled at one of the men to come and then he returned to the truck, threw the drugs in Jason's lap, grabbed the gun and then turned around. A man from the other car was walking up to the defendant, said something in Vietnamese and the defendant shot him.

After the shot was fired, Phoung fled the scene and Jason began to hear shots coming from the tree line. At the same time, the defendant retrieved the shotgun from behind Jason's seat. Next, the defendant and David jumped into the back of the truck and they began to chase the two men in the other car. During the high speed chase, the driver of the other car fell over in his seat and the car coasted over the highway into a church parking lot. Jason pulled up to the side of the car and David

10

and the defendant jumped out of the truck. Next, the defendant grabbed a gas can and poured gas on driver's side of the car and ignited the car.

David got back into the passenger side of the truck, then scooted over, allowing the defendant to enter the passenger side of the truck. Jason then turned the truck around to leave, crossed the highway, when someone looked back and saw that the passenger had gotten out of the car and had started walking. David and the defendant told Jason to go back and so he turned around. The passenger was walking toward the church and then fell to the ground. At that time, either David or the defendant instructed Jason to run over the man. Jason complied, running over the lower portion of the man's body.

Next, the men left the scene and returned to the home of Kyle Manes, the father of Jason and David, where Jason and David also resided. After they arrived, they all got out of the truck, Jason went into the house and David began cleaning off the truck. Phoung and Michelle arrived soon thereafter. At some point, the defendant told everyone to strip down and burn their clothes. Eventually, Kyle returned home and was upset, possibly because someone had told him what happened. After the clothes were burned, Phoung, Michelle, David and the defendant left in Phoung's car while Jason stayed home with his father. According to Jason, the guns were buried back in the woods before they left.

Jason admitted that he was under the influence of drugs at the time of the incident and that his ability to perceive and recall was impaired. Jason testified, however, that he sobered up as the events unfolded and was sober enough to stay on the road traveling at one hundred miles per hour.

11

Kyle Manes was a key witness for the state, and there was no agreement between the state and Kyle for him to testify at the defendant's trial. Kyle stated that he first realized that something was wrong when he saw his son David driving his red truck up the road to their house at a high rate of speed, along with another vehicle, a blue car, usually driven by Phoung. Before he walked up to David, he saw David take a blanket which he believed contained weapons and put the blanket in some brush in the woods. As Kyle approached David, David was cleaning the front of the truck. Later, Kyle stated that he saw a group of people – David, the defendant, Phoung and Michelle – burning clothes. He saw David and the defendant changing clothes.

After David, the defendant, Phoung and Michelle left his home, Jason tried to tell him what happened. At that point, Kyle knew that David had hidden guns in the woods, and he and Jason went out with a flashlight to find them. Kyle eventually retrieved the guns, two shotguns belonging to his son and a pistol, and disposed of them in a bayou located west of his home. A few days after the incident, Kyle cleaned his truck in a car wash before traveling to Houston and cleaned it one more time after that. While in Houston, Kyle replaced the tires on the truck.

After returning from Houston, the truck was submitted to the crime lab. A couple of days later when Kyle retrieved his truck, he was asked to give another statement. At that time, Kyle asked for an attorney. He was subsequently arrested for obstruction of justice. Kyle and his attorney discussed cooperating with the state, and he subsequently gave cooperative statements. Kyle declined to testify at a grand jury hearing in exchange for the dismissal of the charges against him. He was

12

eventually tried and was found guilty of attempted obstruction of justice. He was sentenced to ten years, six years suspended, and was on parole at the time of trial.

The last of the co-defendants to testify was Michelle Hong. Michelle agreed to testify at any and all proceedings, grand jury inquiries and/or trials of the defendant, David Manes, Jason Manes, Phoung Bui, Ben Thompson and Cade Thompson in exchange for immunity from prosecution. At trial, Michelle testified that she was a friend of the defendant for purposes of partying, money and drugs.

On the evening of the incident, Michelle was at the Manes' home and recalled that the defendant received a threatening phone call. The conversation involved meeting with the men, and she did not want the defendant to go because it was not worth hurting or killing someone. Specifically, she heard the defendant talk about killing someone. This upset her, causing her to cry and try to talk the defendant out of doing it.

Michelle also recalled going to a car wash with Phoung and the defendant to meet some men. After the defendant had a conversation with two men, they followed Phoung, Michelle and the defendant to a dark country road. When they arrived at their destination, David was already there in a truck. When their vehicle stopped, the defendant got out of the car and then she heard a couple of bangs. At that time, Phoung drove off and went back to the Manes' house. Afterwards, the defendant and David drove up to the Manes' house. She could not recall if Jason was with them. Michelle testified that while back at the house, she stayed inside and did not see anyone washing a truck or burning clothes. She had seen shotguns that night when they were talking about killing someone, but she stated that she thought the guns were for hunting.

Considering the testimony of the co-defendants in the instant case, especially that of Jason Manes, Phoung's involvement is not as crucial to the state's case as claimed by the defendant. The testimony clearly reflects that Phoung was present, in his car, only when the defendant fired the first shot, but was not present during the pursuit and ultimate gunning down of the victims. Further, the record reflects ample testimony of the co-defendants, other than Phoung's, which detailed the defendant's involvement in the deaths of the victims. Accordingly, considering the criteria set forth in *Robinson*, 817 So.2d 1131, the trial court's refusal to allow the defendant to cross-examine Phoung with regard to his civil involvement with Mr. Ayo was harmless error.

## CONCLUSION

The defendant's convictions are affirmed. However, the case is remanded and the trial court should be directed to inform the defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of its opinion, and to file written proof that the defendant received the notice in the record of the proceedings.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**

This opinion is NOT DESIGNATED FOR PUBLICATION.

Rule 2-16.3, Uniform Rules, Courts of Appeal.