

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 36708-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TODD RAYMOND BUSH, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Todd Bush appeals his convictions for vehicular homicide and

possession of a controlled substance (methamphetamine). He challenges the trial court's

limitation of his cross-examination, and its refusal to grant a mistrial following testimony

that a scale found in Mr. Bush's car was a type used in drug distribution. While the trial

court erred in limiting cross-examination, the error was harmless beyond a reasonable

doubt. The trial court properly exercised its discretion in refusing to declare a mistrial.

We affirm.

FACTS AND PROCEDURAL BACKGROUND

On a late evening in May 2016, Ty Hardin was driving northbound on Division

Street in Spokane, approaching the bridge over the Spokane River. The road has three

northbound lanes at that location, and Mr. Hardin was in the left lane. As he arrived at

the bridge he noticed a black SUV[1] that was traveling ahead of him in the middle lane swerve abruptly into the far right lane and drive up on the sidewalk, where it struck a cyclist. The impact threw the cyclist, Richard Johnson, into the air and over the side of the bridge. Mr. Johnson died from his injuries.

The SUV failed to stop and Mr. Hardin determined to follow it, while his passenger, Ann Huston, called 911. When the SUV made a right-hand turn into what Mr. Hardin knew was a dead-end road, Mr. Hardin turned in behind it and he and Ms. Huston watched as Mr. Bush exited the driver's side door and a woman exited the passenger's side. Jeffrey Miesner, a commercial truck driver was performing a pretrip inspection of his semitruck in an adjacent parking lot, and he, too, saw a man get out from the driver's side and a female get out from the passenger's side after the SUV came to a stop. Mr. Hardin and Ms. Huston observed the female passenger run off after speaking with Mr. Bush.

Responding police officers spoke with Mr. Hardin, Ms. Huston and Mr. Bush, and photographed the SUV, which had extensive damage to the windshield, front end, and passenger side. According to Lieutenant Dean Sprague, Mr. Bush told him that at the time of the collision someone named Jessica, who he had just met, was driving his SUV, and he was in the passenger seat. Lieutenant Sprague would later testify that Mr. Bush

---

[1] Sport-utility vehicle.

could not describe Jessica, claimed not to know her last name, and said she left in an unknown direction. Lieutenant Sprague doubted Mr. Bush's story; for one thing, had Mr. Bush been in the passenger seat "[h]e would have been covered in shiny glass pieces" and "probably would have had some glass cuts." Report of Proceedings (RP) at 208.

After Lieutenant Sprague spoke with Mr. Bush, Spokane Police Officer Michael Huffman, a certified drug recognition expert, was contacted at home and asked to come to the scene to evaluate Mr. Bush. According to Officer Huffman, Mr. Bush admitted that he and a woman he had just met (he referred to her as Jenny) were traveling northbound on Division Street when she lost control of the vehicle, jumped the curb and struck a cyclist. Mr. Bush reportedly reiterated that his new female friend had been driving. Told by Officer Huffman that witnesses saw him leave from the driver's side door, Mr. Bush reportedly told the officer that Jenny had gone over him to leave out the passenger side door after which he moved into the driver's side seat.

Mr. Bush agreed to a portable breathalyzer test, which detected a BAC of .000. He then agreed to submit to a drug recognition evaluation. Officer Huffman concluded that Mr. Bush's performance showed impairment consistent with drug or alcohol use, and he applied for and obtained a search warrant to draw Mr. Bush's blood. A blood test later confirmed the presence of methamphetamine in Mr. Bush's system.

Execution of a warrant to search Mr. Bush's SUV produced a glass pipe, a torch-type lighter, a "baggie" containing a white crystalline substance, and a 500-gram scale

3

that was located in the SUV's center console. The substance in the baggie later tested positive for methamphetamine.

Two days after the collision, the State charged Mr. Bush with vehicular homicide, alleging all three statutory means, one being that he had been driving under the influence of intoxicating liquor or any drug.[2]

In an interview taking place approximately a week after Mr. Johnson was killed, Mr. Bush admitted to Officer Paul Taylor and Detective Brian Shrier that he was the one driving when his SUV struck Mr. Robinson. He admitted that his passenger was his fiancée, Summer Patrick. He explained that the collision occurred because he and Ms. Patrick were arguing, she became violent, and in the course of hitting and kicking at him, her foot got caught in the steering wheel. When he was informed by the officers of the suspected drugs and drug paraphernalia found in searching his car Mr. Bush told them none of it belonged to him; it all belonged to Ms. Patrick.

In June 2017, the State amended the information to add a charge of possession of a controlled substance (methamphetamine).

---

[2] Under RCW 46.61.520(1), a driver is guilty of vehicular homicide if his or her driving results in the death of a person within three years as a result of injury proximately caused by his or her driving, if the driver was operating a motor vehicle "(a) While under the influence of intoxicating liquor or any drug, as defined by RCW 46.61.502; or (b) In a reckless manner; or (c) With disregard for the safety of others."

The case proceeded to a jury trial in January 2019.  Before opening statements, the State asked the trial court to foreclose an area of cross-examination of eyewitness Hardin. It explained that Mr. Hardin had a pending criminal charge and had received unusually lenient treatment in connection with two other recently resolved charges.  The prosecutor represented that this was not through any cooperation understanding with the State, but was the result of a mistaken calculation by different prosecutors of Mr. Hardin's offender score.  The State was concerned that the defense might try to suggest through cross-examination that Mr. Hardin's testimony was shaded in favor of the State by his hope of favorable treatment.  To obtain a ruling by the court before opening statements, the prosecutor wished to examine Mr. Hardin outside the presence of the jury, to establish that he had no cooperation agreement with the State presently, nor had his recent lenient treatment been the result of any cooperation understanding.

Defense counsel pointed out that the jury would hear evidence about Mr. Hardin's criminal history regardless, since Mr. Hardin had committed several crimes of dishonesty admissible under ER 609.  Defense counsel did not object to the State's proposed examination and even said, "I would like to ask [Mr. Hardin] about his subjective beliefs because I think that's important.  It goes to bias."  RP at 136.

In the examination outside the jury's presence that followed, the State elicited the following testimony from Mr. Hardin:

5

Q      Now, in relation to the charges that were adjudicated or that you pled to in June of 2018, do you feel that you received a deal in exchange for being a witness in this case?

A      No.

Q      Were you at any point offered consideration from the State for your testimony?

A      No.

RP at 140-41.  During cross-examination, Mr. Hardin testified in relevant part:

Q      And since then you've been in court for a theft third degree from 2017, two counts of theft for 2017; is that right?

A      Correct.

Q      And then later on you were in court here this year for a trafficking in stolen property; is that right?

A      Yes.

Q      And then that was dropped down to theft 2 with intent to resell?

A      No.  It was taken off and I accepted because there were two charges.

Q      I see.  So the trafficking was dropped?

A      Trafficking was dropped.

. . . .

Q      Did it ever cross your mind that perhaps you would receive some sort of leniency or mercy by the prosecutor because you were being cooperative in coming to court on the Todd Bush case?

A      I wish, but it wasn't.

Q      Okay.  You wished that that would be the case?

A      Yeah, but that was not.  They never offered me anything and I didn't ask for anything.

Q      Okay.

A      *As a criminal, we, of course, would wish something to be like that*, but it didn't happen.

6

Q      Okay.  So that was your hope that that would occur, but you don't feel you got any leniency because of your assistance?

A      *It wasn't my hope just on that charge.  It's hope on every charge, you know.*  It wasn't part of the deal.  My deal was that my points have dropped and cleared away and I accepted what I did.

RP at 141-43 (emphasis added).

Following this testimony, the State asked the trial court to prohibit the defense from any questioning suggesting it had given, or might give, Mr. Hardin consideration or a deal in exchange for his testimony.  The defense argued that while Mr. Hardin denied having an agreement, it should still be allowed to question him about his hope of getting leniency on account of cooperating.

The court granted the State's motion, explaining that because there was no cooperation agreement, the prejudicial effect of suggesting such an agreement without a foundation in fact outweighed the probative value of Mr. Hardin's subjective hope.

Mr. Hardin was the State's first witness, and after eliciting his name and address, the prosecutor immediately had him affirm that he had a conviction for trafficking in stolen property in 2010, a second degree theft conviction in 2011, two convictions for third degree theft in 2017, and most recently a second degree theft from 2018.  She then turned to what Mr. Hardin had observed and done in connection with witnessing Mr. Bush strike Mr. Johnson with his vehicle in May 2016.

Ms. Huston was the State's next witness.  She testified to seeing Mr. Bush's SUV hit the curb, saw sparks, and realized a cyclist had been struck, at which point she called

911. She remained on the 911 call after they followed Mr. Bush's SUV into the dead-end road, and described the vehicle and driver to the dispatcher. She left the scene to walk to her nearby home to relieve a babysitter, but was stopped by an officer and agreed to return for a show-up identification.

During the morning break taken following Ms. Huston's testimony, Mr. Bush moved to preclude the State from making any reference in the State's case in chief to the 500-gram scale found in his SUV. He argued it had no probative value, and having a scale that could weigh up to a half kilogram would "make Mr. Bush look like a drug dealer or that he has some sort of voracious appetite for methamphetamine." RP at 188. The State argued the scale was relevant to Mr. Bush's access to and potentially recent use of drugs. The trial court denied Mr. Bush's motion to exclude reference to the scale, concluding that its probative value outweighed any prejudice.

When testimony resumed, Mr. Miesner testified to his observations of the actions of Mr. Bush and his female passenger after Mr. Bush stopped the car. The State also called a third eyewitness to the collision—a woman who had been driving home from work and was following Mr. Bush's SUV when it suddenly "veered off to the right[,] . . . climbed the sidewalk, [and] hit the man on the bike." RP at 213. She testified that she had parked her car, run back to the site of the collision, and made her own 911 call.

The State's remaining witnesses were police officers, forensic experts, an evidence supervisor, and the county medical examiner. One of the officers, Detective Shrier,

8

testified to the search of Mr. Bush's SUV and the baggie and paraphernalia that had been found. The prosecutor questioned him about photographs of the evidence seized. On arriving at a photograph of the scale, the following examination and objection occurred:

> Q   Could you describe to the jurors what exactly we are looking at here in terms of Exhibit No. 69?
>
> A   This is the same 500-gram digital scale that I recovered from the interior of the center console storage area.
>
> Q   That's the same scale we saw in Exhibits No. 38 and 39?
>
> A   It is, sir.
>
> Q   Now, Detective, could you explain to us what, if any, significance this particular piece of evidence has to you?
>
> A   A small 500-gram, under-a-pound scales that are generally located— that I've located in the past in other cases are a lot of times part of a drug distribution.
>
> [DEFENSE COUNSEL]:  I'm going to object, Your Honor.  Move to strike.  Move for a mistrial.
>
> THE COURT:  Why don't you come to the bench.

RP 279-80.  After a brief sidebar, the State suggested that the jury be excused.  The trial court agreed and announced a recess.

Outside the presence of the jury, Mr. Bush argued a mistrial was required because the scale had "nothing to do with ingesting methamphetamine" and the detective's statement portrayed him as even worse than a meth *user*, a category already held in low regard.  RP at 284.

The State responded that the scale was relevant to its burden of proving possession.  The State also argued that mistrial was not an appropriate remedy because it

9

could clarify through further questions of Detective Shrier that Mr. Bush was not charged

with drug distribution.

The trial court denied Mr. Bush's motion for a mistrial. It agreed with the defense

that it was irrelevant that a scale of the type found in Mr. Bush's SUV might be used for

drug distribution. It rejected the defense argument that the question was calculated to

elicit Detective Shrier's drug distribution response, however. It ruled that the appropriate

remedy was a curative instruction and invited the defense to craft one. When the

defense's proposal proved unacceptable to the court, it wrote its own strong admonition:

> Members of the jury, just before we broke, the defense objection to a statement of Officer Brian Shrier about distribution of drugs is sustained. In other words, it was correct to object. You shall strike it from the evidence in this case and not consider it in any manner.
> Please recall my instructions about the necessity of following my instructions and the need to disregard or strike testimony from time to time.
> If there is any juror, including the alternate, who does not think that she or he can follow my instructions and do as I have instructed, please raise your hand.
> Seeing none, we'll proceed.

RP at 301-02.

After the State's remaining witnesses, Mr. Bush testified in his own defense. As

he had told Officer Taylor and Detective Shrier when interviewed, Mr. Bush testified that

Ms. Patrick began kicking and punching him as he approached the Division Street

Bridge. He claimed he tried to keep control of the steering wheel without success. He

testified that while he was not sure where the cyclist was, he was "pretty sure that the

cyclist had to have been in the street." RP at 657. He testified he was not under the

influence of any drugs and did not ingest methamphetamine on the day of the collision.

He testified that the methamphetamine and paraphernalia found inside his SUV belonged

to Ms. Patrick.

The jury found Mr. Bush guilty as charged and found by special verdict that the

State had proved all three alternative means for vehicular homicide. The trial court

sentenced Mr. Bush to a standard range sentence of 112 months. He appeals.

## ANALYSIS

I. WHILE THE TRIAL COURT ABUSED ITS DISCRETION IN LIMITING CROSS-
EXAMINATION, THE ERROR WAS HARMLESS BEYOND A REASONABLE DOUBT

Mr. Bush first assigns error to the trial court's ruling prohibiting cross-

examination into whether Mr. Hardin's interest in receiving favorable treatment from the

State affected his motivation to testify.

"Both the federal and state constitutions protect a defendant's right to confront an

adverse witness." *State v. Lee*, 188 Wn.2d 473, 486, 396 P.3d 316 (2017); *see also* U.S.

CONST. amend. VI; WASH. CONST. art. I, § 22; *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.

Ct. 1105, 39 L. Ed. 2d 347 (1974). "'The main and essential purpose of confrontation is

*to secure for the opponent the opportunity of cross-examination.*'" *Lee*, 188 Wn.2d at

487 (quoting *Davis*, 415 U.S. at 315-16). "[T]he exposure of a witness' motivation in

testifying is a proper and important function of the constitutionally protected right of

11

cross-examination." *Davis*, 415 U.S. at 316-17 (citing *Greene v. McElroy*, 360 U.S. 474, 496, 79 S. Ct. 1400, 3 L. Ed. 2d 1377 (1959)). Nonetheless, "[t]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). We review a limitation of the scope of cross-examination for an abuse of discretion. *Lee*, 188 Wn.2d at 486.[3]

The State's motion to limit cross-examination proceeded on the assumption that a criminal defendant's right to cross-examine a witness for motive or bias extends to cooperation agreements, but not to a witness's hope or concern about how his or her testimony might affect their own legal jeopardy. Case law holds otherwise. In *Davis*, the seminal case identifying the right to cross-examine concerning witness bias, the claim of bias that the United States Supreme Court held the defendant had a right to explore was

---

[3] A number of federal courts have held that some confrontation clause challenges to limits on cross-examination are subject to de novo review. The Ninth Circuit, for example, has held that if the confrontation clause challenge is based on the exclusion of an area of inquiry, review is de novo; if the limitation is, instead, on the scope of questioning *within* a given area, the limitation is reviewed for abuse of discretion. *United States v. Larson*, 495 F.3d 1094, 1100-02 (9th Cir. 2007) (en banc), *cert. denied*, 552 U.S. 1260, 128 S. Ct. 1647, 170 L. Ed. 2d 359 (2008) (discussing inter- and intra-circuit conflicting analyses and collecting cases). The Washington Supreme Court has not had occasion to address this distinction.

"an inference of undue pressure because of [the witness]'s vulnerable status as a probationer, as well as of [his] possible concern that he might be a suspect." 415 U.S. at 318 (citation omitted). A number of federal courts have explicitly rejected the contention that the right to cross-examine into bias is limited to cooperation agreements and does not extend to a hope for favorable treatment. *See, e.g.*, *United States v. Lankford*, 955 F.2d 1545, 1548-49 (11th Cir. 1992) (notwithstanding that witness had made no deal with the government, his desire to cooperate might have been motivated by an effort to prevent an investigation involving his sons); *United States v. Alexius*, 76 F.3d 642, 645 (5th Cir. 1996) (witness with pending charges at the time he testified was in a "'vulnerable status'" with respect to the government); *United States v. Sarracino*, 340 F.3d 1148, 1167 (10th Cir. 2003) (defendant had a right to confront witness about possible, not pending criminal charges against the witness); *United States v. Martin*, 618 F.3d 705, 728 (7th Cir. 2010) (witness's denial of the existence of a cooperation agreement "does not end the matter"); *United States v. Anderson*, 881 F.2d 1128, 1138-39 (D.C. Cir. 1989) (requiring evidence of an actual cooperation agreement overlooks the inherent and independent relevance of the fact of a recently dismissed charge "which hung over the witness' head like the sword of Damocles").

It is an easy matter to conclude that Mr. Bush was not prejudiced in the context of the entire trial by the limitation on cross-examination. Mr. Bush admitted the first time he was questioned that his SUV struck Mr. Johnson; he admitted a week later that he had

been driving; given other eyewitnesses, Mr. Hardin's evidence was cumulative; and Mr.

Hardin had no evidence to offer on Mr. Bush's defense that his fiancée kicking at the

steering wheel was an intervening cause. But while a violation of a defendant's Sixth

Amendment right to cross-examine is subject to harmless error analysis, "the focus of the

prejudice inquiry in determining whether the confrontation right has been violated must

be on the particular witness, not on the outcome of the entire trial." *Van Arsdall*, 475

U.S. at 680.

Applying Washington's three-part test for determining whether limiting the scope

of cross-examination violates a defendant's confrontation right, we find that Mr. Bush's

right was violated here. The Washington test provides:

> "First, the evidence must be of at least minimal relevance. Second, if
> relevant, the burden is on the State to show the evidence is so prejudicial
> as to disrupt the fairness of the fact-finding process at trial. Finally, the
> State's interest to exclude prejudicial evidence must be balanced against
> the defendant's need for the information sought, and only if the State's
> interest outweighs the defendant's need can otherwise relevant information
> be withheld."

*Lee*, 188 Wn.2d at 488 (quoting *State v. Darden*, 145 Wn.2d 612, 622, 41 P.3d 1189

(2002)).

Applying step one of the three-part test, cross-examination into Mr. Hardin's

recently resolved charges, his pending charge, and his hope for leniency on every charge,

could be expected to elicit evidence that was at least minimally relevant.

14

Applying step two, it was uncontested that Mr. Hardin had four convictions that were admissible under ER 609, so jurors would learn that he had a criminal history. The State could establish through its own examination that Mr. Hardin had no deal and that no deal had been offered. Any suggestion on cross-examination that Mr. Hardin's statement was the product of an improper influence or motive could be countered by evidence of his statement to police on the night Mr. Johnson was killed. *See* ER 801(d)(1)(ii). The State could point out in closing argument that given the cumulative evidence, Mr. Hardin could not reasonably expect to receive favorable treatment for his testimony. Given these facts, the State has not shown how a defense examination into bias would be so prejudicial as to disrupt the fairness of the fact-finding process at trial. Absent that showing, we do not proceed to the weighing provided by step three.

As signaled by our discussion of prejudice, however, the trial court's limitation on cross-examination was harmless beyond a reasonable doubt. The Washington Supreme Court explained harmless error review in this context in *State v. Romero-Ochoa*:

> In the context of an erroneous exclusion of impeachment evidence, "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, [we can] nonetheless say that the error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684. Consistent with our overwhelming untainted evidence test, this inquiry requires us to find the error harmless if, in light of the entire trial record, we are convinced that the jury would have reached the same verdict absent the error. Relevant considerations include the properly admitted direct and circumstantial evidence (i.e., the strength of the State's case and the plausibility of the defense theory) and the overall significance of the erroneously admitted or excluded evidence in this context (e.g., whether it

15

was cumulative or corroborated, or consistent with the defense theory).
*Van Arsdall*, 475 U.S. at 684.

193 Wn.2d 341, 348-49, 440 P.3d 994 (2019) (alterations in original) (footnote and some

citations omitted), *review denied*, 195 Wn.2d 1010, 460 P.3d 173 (2020).

In light of the entire trial record, we are convinced that the jury would have

reached the same verdict even if Mr. Hardin had been fully examined about whether he

believed that testimony favorable to the State might help him resolve his pending charge.

All matters addressed by Mr. Hardin's testimony were not only corroborated by others;

they were essentially uncontroverted.

II.     THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING THE MOTION FOR A
        MISTRIAL

Mr. Bush's remaining assignments of error deal with Detective Shrier's testimony

that the drug scale found in the console of Mr. Bush's SUV was a type the detective had

"located in the past in other cases are a lot of times part of a drug distribution."  RP at

280.  We can summarily reject his contentions on appeal that this was improper

propensity evidence under ER 404(b) and, lacking proper purpose under that rule,

violated due process.  ER 404(b) makes propensity evidence inadmissible.  Detective

Shrier's statement was not admitted.

We also reject Mr. Bush's argument for the first time on appeal that the manner in

which the trial court addressed the objection—conducting the sidebar, excusing the jury,

and extending the recess in order to craft a curative instruction—"likely did more harm

16

than good." Appellant's Reply Br. at 4 (internal quotation marks and citation omitted).

Mr. Bush did not raise these objections in the trial court and we will not consider them.[4]

RAP 2.5(a).

The assignment of error that remains is that the trial court erred by denying Mr.

Bush's motion for a mistrial. A trial court should grant a mistrial when an irregularity in

the trial proceedings is so prejudicial that it deprives the defendant of a fair trial. *State v.*

*Babcock*, 145 Wn. App. 157, 163, 185 P.3d 1213 (2008). More than "a possibility of

prejudice" must be shown. *State v. Lemieux*, 75 Wn.2d 89, 91, 448 P.2d 943 (1968).

Courts look to three factors to determine whether a trial irregularity warrants a new trial:

(1) the seriousness of the irregularity, (2) whether the statement was cumulative of

evidence properly admitted, and (3) whether the irregularity could be cured by an

instruction. *State v. Perez-Valdez*, 172 Wn.2d 808, 818, 265 P.3d 853 (2011). Because

the trial judge is in the best position to determine the prejudice of circumstances at trial,

an appellate court reviews the decision to grant or deny a mistrial for abuse of discretion.

*Babcock*, 145 Wn. App. at 163.

In this case, evidence was presented that while driving his SUV, with

methamphetamine in his car and in his bloodstream, Mr. Bush struck a cyclist who had

---

[4] While the trial court gave defense counsel the opportunity to propose its own curative instruction, which the trial court then reviewed and rejected, that alone would not be sufficient to preserve error. If Mr. Bush had an objection to the curative instruction crafted by the court, he needed to raise it.

no opportunity to protect himself, in a manner likely to cause death or serious injury. He then failed to slow or stop and after being apprehended, lied about whether he had been driving and who he had been with.

In the context of all of the trial evidence, we are unpersuaded that a single statement that Mr. Bush's console contained a scale of a sort commonly used in drug distribution was so prejudicial that a mistrial was the only remedy that would afford him a fair trial. The trial court did not abuse its discretion in choosing, instead, to strike the statement and admonish the jury.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Fearing, J.

_____
Pennell, C.J.